IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI

JOHN HAMBACKER, VERONICA HAMBACKER,   )
MARK BERLINGERI, SUSAN BERLINGERI,   )
STEPHAN BILSKI, KATHY BILSKI,   )
JAMES BLACKSTON, DEBRA BLACKSTON,   )
ROSETTA BLEDSOE, GREGORY BORGE,   )
TERRY BOWMAN, MELINDA BOWMAN,   )
VERNE BRADY, CINDY BRADY, CARLOS   )
BRAGA, BETSY BRAGA, MARION   )
BRONSON, LENA BRONSON, JAMES BROWN,   )
JAMES BROYLES, SHEILA BROWN,   )
PATRICK CANNING, COLLEEN CANNING,   )
HOWARD CAPEK, MARTHA CAPEK, DALE   )
CARDEN, WANDA CARDEN, CHARLES CASH,   )
JR., JULIA CASH, CHANTAL CHAPOTEAU,   )        Case No.:
ERICA CHARLES, AUBREY CHARLES,   )
NEWTON CHRISTMAN, BARRY CLAY,   )        JURY TRIAL DEMANDED
LENA CLAY, LARRY CLEVERINGA,   )
MARILYN CLEVERINGA, RALPH COCHRAN,   )
LINDA COCHRAN, FLORENCE COLEMAN,   )
JAMES COLLIER, ALVA COLLIER, ELMO   )
COOK, MATHELDA COOK, KEVIN COOK,   )
SHELIA COOK, MICHAEL COX, PAMELA   )
COX, WILLIAM CREAGAN, ROSALIND   )
CREAGAN, ANTHONY CREST, BARBARA   )
CRIST, SAMUEL CRUM JR., MONA   )
CRUM, PATRICIA DAMRON-ROBINSON,   )
JEFFERY DAMRON-ROBINSON, GEORGE   )
DANBURY, CATHERINE DANBURY, LINDA   )
DANIEL, DAVID DARLING JR., ROBERT DASH,   )
DONNA DASH, RANDOLPH DAVIS, JEANNE   )
DAY, TIMOTHY LUDDEN, ARTHUR DELBENE,   )
THOMAS DEWITT, PAULINE DEWITT, AHMET   )
DIRICAN, JOHN DOUGHERTY, SYLVIA   )
DOUGHERTY, ROBERT DOWNING,   )
BONNIE DOWNING, JANIECE DRASSLER,   )
ERMA DUKES-ELLIS, WALTER EARL,   )
KAREN EARL, MICHAEL ECTOR, SUZETTE   )
ECTOR, HARMON EDMOND, SHIRLEY   )
EDMOND, MARK FARBER, TERESA FARBER,   )
RICKEY FARR, LYNN FARR, JOHNNY   )
FENDER, KELLIE FENDER, MARQUIES FIELDS,   )
JOSEF FILA, MARY FILA, RANDALL FILGER,   )
CAROLYN FILGER, BARBARA FOLEY,   )
CELESTINE FRAZIER, ADDIE FREYTAG,   )
JOSEPH GAGLIANO, LORENE GAGLIANO,   )
JOEL GARHARTT, ROSE GARHARTT,   )
PRISCILLA GIBSON, ANGELA MARCOUX,   )

TIMOTHY GIBSON, SHERRI GIBSON, LARRY      )
GORDON, JAN GORDON, NORMA GORMAN,          )
FRANCIS GORMAN, JOHN GREENE, FRANCES       )
GREENE, ROBERT GRUBER, EUGENIA             )
GRUBER, DOUGLAS GUERNSEY, MICHELLE         )
GUERNSEY, JAMES GUTILLO, PATRICIA          )
GUTILLO, DAVID HANAUER, ELIZABETH          )
HANAUER, JOSEPH HARRAH, LORI HARRAH,       )
CHRISTOPHER HARRIS, SHARMAN                )
GINGRICH, ELIZABETH HARTMAN,               )
CLAUDETTE HASKINS, JEROME HAYNES,          )
JANET HAYNES, WENDELL HILL, CAROLYN        )
HOLLOWAY, JOEL HOLST, LAURA HOLST,         )
GARY HORTON, NATIVIDAD HORTON,             )
DELMER HUFFMAN, PATRICIA HUFFMAN,          )
JUANITA HUGHES, LARRY JACOBS, JEWEL        )
JACOBS, SIDNEY JANISE, JOHN JANSEN,        )
KAREN JANSEN, WILLIS JONES, DORIS JONES,   )
ROBIN  JORDAN, JAY KASDORF, PATRICIA       )
KASDORF, JAMES KELLY, PATRICIA KELLY,      )
KENNETH KEYS, EDITH KEYS, MATTHEW          )
KRAATZ, DIANA KRAATZ, ROBERT LARSON,       )
JOSEPH LEE, DOREEN LEE, HELENA LETSCH,     )
ANN LEWANDOWSKI, ALLISON                   )
LEWANDOWSKI, HARRY LEWIS, LEVERNA          )
LEWIS, VINCENT LIVINGSTON, ANGELA          )
LIVINGSTON, DEANNA LYNCH, CHRISTOPHER      )
LYNCH, WILLIAM LYNCH, CHERYL LYNCH,        )
JIM MAGUIRE, RAYMOND MAKOVICKA,            )
BETTY MAKOVICKA, THOMAS MARSH, NIA         )
MARSH, HOWARD MARSHALL, LINDA              )
MARSHALL, DONALD MARTIN, ANNE              )
SHEALS, MARYANN MAYO, LESLIE MCCOY,        )
DARRELL MCDONALD, JANET MCDONALD,          )
JOSE MEDINA, MYCHEL MEDINA, SANDRA         )
MERCER, LARRY MERCER, WILLIAM              )
MERCER, LINDA MERCER, EARNEST              )
MINER, JULIA MORGAN, RODGER MORGAN,        )
MELINDA MORGAN, RUTH MORIN, EDWARD         )
MORRIS, KAREN MORRIS, JEROME MORRIS,       )
ALTHEA MORRIS, JOSEPH MORRISON, LINDA      )
MORRISON, DONALD MORSE, DELMIRE            )
MORSE, ROSE NELSON, DONALD NELSON,         )
PEDRO NIETO, FELIPA NIETO, ELVIN           )
NORMAN, CAROL NORMAN, IRENE OBERA,         )
GEORGE PEDRICK, JOSE GUZMAN, TAMORA        )
PENNELL, JOHN PETROVIC, MARGARET           )
PETROVIC, WILLIAM POTARIS, GEORGIA         )
POTARIS, JOSEPH PRATTI, GRACE PRATTI,      )
ROGER QUADE, PATRICIA QUADE, JOHNNIE       )
QUARTERMAN, IDA QUARTERMAN, ROSE           )

2

RANEY, WILLARD RAPER, JACKIE RAPER,      )
COREY RAY, SHIRLEY RAY, ANYA REY,        )
NORMAND RHEAUME, CATHERINE RHEAUME,      )
ERIC RICHARDSON, GLORIA RICHARDSON,      )
LARRY RICHARDSON, WALTER RICHARDSON,     )
DARLENE RICHARDSON, JAMINE ROGERS,       )
GERT ROHALL, TERRY ROHALL, JON ROSE,     )
WILLIAM RUSS, JANICE RUSS, DAN RUSSELL,  )
DONN RUSSELL, CAROLYN RUSSELL, KEITH     )
SADOWSKY, LINDA SADOWSKY, EDWARD         )
SANDERS, SHIRLEY SANDERS, TERESITA       )
SANTIAGO, JAMES SELLERS, OLIVIA          )
SELLERS, DAVID SHAEFER, KATHLEEN         )
SHAEFFER, RALPH SIEGEL, MARILYN SIEGEL,  )
ROBERT SMITH, DOUG SOLSBY, EVA SOLSBY,   )
MARK SOUTHWICK, VICKY SOUTHWICK,         )
ROBERT STEWART, DONNA HARRISON,          )
PHILLIP STOCKS, WILMA STOCKS, MARCEL     )
TAJCHMAN, JOHN THOMPSON, PATRICIA        )
THOMPSON, ALEXANDER UMANA, ROSA          )
UMANA, CLARA VILLEGAS, LUIS VILLEGAS,    )
MICHAEL VOORHEES, PATRICIA VOORHEES,     )
RONALD WALKER, RUDOLPH WALKER,           )
GLINDER WALKER, JERRY WARD, SHEILA       )
WARD, LYNN WATTS, THOMAS WEIMER,         )
JOANN WEIER, RANDY WHEELER, JOHNNIE      )
WIEDEMAN, MAUREEN DUNN, HAROLD           )
WILLIAMS, MARGRETTA WILLIAMS, WYNARD     )
WILLIAMS, TIFFANY WILLIAMS, NORBERT      )
WNUKOWSKI, DEBORAH WNUKOWSKI, and        )
DAVID YARBOROUGH,                        )
                                         )
                     Plaintiffs,         )
                                         )
v.                                       )
                                         )
WESTGATE RESORTS, LTD., L.P.             )
a/k/a WESTGATE RESORTS, LTD.,            )
CENTRAL FLORIDA INVESTMENTS,             )
INC., WESTGATE RESORTS, INC.,            )
WESTGATE GV SALES & MARKETING,           )
LLC, WESTGATE VACATION VILLAS,           )
LLC, and CFI RESORTS MANAGEMENT,         )
INC.                                     )
                                         )
Serve all Defendants at:                 )
                                         )
       Corporation Service Company       )
       221 Bolivar Street                )
       Jefferson City, MO 65101          )
                                         )
                                         )

## PETITION

COME NOW Plaintiffs, by and through undersigned counsel, and as representatives of a class of persons similarly situated, and for the Class Action Petition against the Defendants named herein, state as follows:

## INTRODUCTION

Defendants, various entities associated with the Westgate Branson Woods Resort in Branson, Missouri, Westgate Branson Lakes Resorts in Hollister, Missouri, Westgate Smoky Mountain Resort in Gatlinburg, Tennessee, Westgate Las Vegas Resorts in Las Vegas, Nevada, Westgate Myrtle Beach Oceanfront Resorts in South Carolina and Westgate Orlando Resorts in Orlando, Florida, use a high-pressure scheme that involves convincing prospective purchasers to buy into its vacation timeshare program while failing to adequately disclose material and legally required information to buyers.  Through this scheme, Defendants (a) fail to adequately provide legally required disclosures and (b) fail to provide purchasers with adequate access to their timeshares, as follows:

A.       Westgate fails to adequately provide customers with legally required disclosures.  Specifically:

1.       Westgate fails to adequately train and supervise its sales agents, fails to provide them with disclosures to give to prospective customers, and encourages them to lie to customers in the context of high-pressure sales pitches.

2.       Westgate relies on its closing agents to provide written disclosures, but then provides them with a closing folio to use that contains a "secret pocket" where

4

the closing officers can conceal legally required disclosures about the purchasers'
rights, including their statutory right to rescind their purchase.

B.      Westgate fails to provide purchasers adequate access to their timeshares.
Specifically:

1.      Westgate fails to adequately disclose to purchasers that their
timeshare interest will be subject to a "floating use" plan.

2.      Westgate fails to adequately describe to purchasers the terms of the
"floating use" plan.

3.      Westgate's "floating use" plan fails to provide purchasers reasonable
access to their timeshares.

As a result of the common scheme, Westgate owners are left paying thousands
of dollars in purchase price, upgrade costs, and annual maintenance fees, all on
timeshare units they are frequently unable to use as advertised, and rarely, if ever, are
able to use as reasonably expected.

Westgate's aggressive business model relies on one essential premise: it makes
money by selling shares in property units, not by customers using the weeks they have
purchased in those units.  In fact, Westgate has a strong incentive to sell as many
ownership shares as possible in a piece of property.  It can then further increase its
profits by limiting owners' use of the units so they can be rented out by Defendants for
additional profit or used by Defendants as sample units to sell timeshare properties to
new buyers.  In this way, Westgate profits many times by selling and overselling

various interests in one piece of property: it can sell it repeatedly at a premium, rent it repeatedly, and repeatedly use it as a tool to induce new sales—sometimes all at once. Defendants uniformly fail to adequately disclose material facts to buyers and, as a result, fail to deliver what buyers reasonably expect, all in violation of Missouri, Florida, Nevada, and Tennessee common law and statutory law.

## JURISDICTION AND VENUE

1.     Subject matter jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d). The federal Class Action Fairness Act (CAFA) provides for federal jurisdiction over a "mass action." 28 U.S.C. § 1332(d)(11)(A).

2.     This cause is a 'mass action' as it is a "civil action ... in which monetary relief claims of 100 or more persons are proposed to be tried jointly on the ground that the plaintiffs' claims involve common questions of law or fact[.]" Id. at § 1332(d)(11)(B)(i).

3.     Between Plaintiffs and Defendants there exists at least "minimal diversity" as "any member of a class of plaintiffs is a citizen of a State different from any defendant." §§ 1332(d)(2)(A), (d)(11)(A).

4.     The aggregate amount in controversy as to all Plaintiffs' claims exceed $5 million. §§ 1332(d)(2), (d)(6), (d)(11)(A).

5.     At least three Plaintiffs have claims that satisfy the $75,000 individual amount in controversy requirement 28 U.S.C. §§ 1332(a), (d)(11)(B)(i)).

6.      This Court has both general and specific personal jurisdiction over Defendants because Defendants have continuous and systematic general business contacts in this District.  Defendants own, maintain, operate, collect payments, and/or derive revenue from the sale of property in this District, and had contact with this District specifically with respect to the events giving rise to Plaintiffs' and Class Members' claims.  Defendants have purposefully and voluntarily availed themselves of this Court's jurisdiction by engaging in and/or profiting from real property transactions in this District.

7.      This Court has both general and specific personal jurisdiction over Defendants, including under Missouri's Long Arm Statute, V.A.M.S. § 506.500, et seq., because Defendants have continuous and systematic general business contacts in Missouri. Defendants own, maintain, operate, collect payments, and/or derive revenue from the sale of property in Missouri, and had contact with Missouri specifically with respect to the events giving rise to Plaintiffs' and Class Members' claims. Defendants have purposefully and voluntarily availed themselves of this Court's jurisdiction by engaging in and/or profiting from real property transactions in Missouri.

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District, and the property that is the subject of this action is situated in this District. Westgate conducts substantial business in this District, has marketed, advertised, and sold timeshare properties in this District, and has caused harm to Class Members residing in this District.

7

9.     Any purported forum selection clause in the contract at issue in this case is invalid and unenforceable, to the extent that the contract at issue in this case, and/or each portion thereof, resulted from misrepresentation, fraudulent inducement, duress, abuse of economic power, or other unconscionable means.  The forum-selection clause at issue here is a contract of adhesion that Plaintiffs and members of the proposed class had no opportunity to negotiate and requiring Plaintiffs and members of the class to litigate in Defendants' choice of forum would be unjust.

## **PARTIES**

**Plaintiffs:**

10.     John and Veronica Hambacker are natural persons residing in and domiciled in Salem, Missouri, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

11.     Mark and Susan Berlingeri are natural persons residing in and domiciled in Newburgh, New York, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

12.     Stephan and Kathy Bilski are natural persons residing in and domiciled in Oak Forest, Illinois, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

13.     James and Debra Blackston are natural persons residing in and domiciled in Liberty, South Carolina, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

14.     Rosetta Bledsoe is a natural person residing in and domiciled in Grenada, Mississippi, who is the legal and rightful owner of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

15.     Gregory Borge is a natural person residing in and domiciled in Jamestown, Rhode Island, who is the legal and rightful owner of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

16.     Terry and Melinda Bowman are natural persons residing in and domiciled in Crestwood, Kentucky, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

17.     Verne and Cindy Brady are natural persons residing in and domiciled in Charlotte, North Carolina, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

18.     Carlos and Betsy Braga are natural persons residing in and domiciled in Rehoboth, Massachusetts, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

19.     Marion and Lena Bronson are natural persons residing in and domiciled in Meridian, Mississippi, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

20.     James and Sheila Brown are natural persons residing in and domiciled in Birmingham, Alabama, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

21.     James Broyles is a natural person residing in and domiciled in Florissant, Missouri, who is the legal and rightful owner of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

22.     Patrick and Colleen Canning are natural persons residing in and domiciled in Guthrie, Oklahoma, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

23.     Howard and Martha Capek are natural persons residing in and domiciled in Staten Island, New York, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

24.     Dale and Wanda Carden are natural persons residing in and domiciled in Burlington, Iowa, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

25.     Charles Cash, Jr. and Julia Cash are natural persons residing in and domiciled in Marion, Alabama, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

26.     Chantal Chapoteau is a natural person residing in and domiciled in Brooklyn, New York, who is the legal and rightful owner of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

27.     Aubrey and Erica Charles are natural persons residing in and domiciled in Williamstown, New Jersey, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

28.     Newton Christman is a natural person residing in and domiciled in Wichita, Kansas, who is the legal and rightful owner of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

29.     Barry and Lena Clay are natural persons residing in and domiciled in Memphis, Tennessee, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

30.     Larry and Marilyn Cleveringa are natural persons residing in and domiciled in Oak Forest, Illinois, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

31.     Ralph and Linda Cochran are natural persons residing in and domiciled in Oak Forest, Illinois, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

32.     Florence Coleman is a natural person residing in and domiciled in Brooks, Kentucky, who is the legal and rightful owner of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

33.     James and Alva Collier are natural persons residing in and domiciled in Gainesville, Florida, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

34.     Elmo Cook, Jr., Mathelda Cook, Kevin Cook and Shelia Cook are natural persons residing in and domiciled in Spotsylvania, Virginia who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

35.     Michael and Pamela Cox are natural persons residing in and domiciled in Oakdale, California, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

36.     William and Rosalind Creagan are natural persons residing in and domiciled in Martinez, Georgia, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

37.     Anthony Crest is a natural person residing in and domiciled in Marietta, Georgia, who is the legal and rightful owner of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

38.     Barbara Crist is a natural person residing in and domiciled in Prescott Valley, Arizona, who is the legal and rightful owner of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

39.     Samuel Crum Jr. and Mona Crum are natural persons residing in and domiciled in Chasse, Louisiana, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

40.     Jeffery and Patricia Damron-Robinson are natural persons residing in and domiciled in Griffith, Indiana, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

41.     George and Catherine Danbury are natural persons residing in and domiciled in Conway, South Carolina, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

42.     Linda Daniel is a natural person residing in and domiciled in Detroit, Michigan, who is the legal and rightful owner of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

43.     David Darling Jr. is a natural person residing in and domiciled in Salisbury Center, New York, who is the legal and rightful owner of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

44.     Robert and Donna Dash are natural persons residing in and domiciled in Greeneville, North Carolina, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

45.     Randolph Davis is a natural person residing in and domiciled in Las Vegas, Nevada, who is the legal and rightful owner of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

46.     Timothy Ludden and Jeanne Day are natural persons residing in and domiciled in Portland, Maine, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

47.     Arthur Delbene is a natural person residing in and domiciled in Bridgeport, Connecticut, who is the legal and rightful owner of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

48.     Thomas and Pauline Dewitt are natural persons residing in and domiciled in Rohnert Park, California, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

49.     Ahmet Dirican is a natural person residing in and domiciled in Bedford, Massachusetts, who is the legal and rightful owner of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

50.     John and Sylvia Dougherty are natural persons residing in and domiciled in Decatur, Illinois, who is the legal and rightful owner of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

51.     Robert and Bonnie Downing are natural persons residing in and domiciled in Nipomo, California, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

52.     Janiece Drassler is a natural person residing in and domiciled in Griffith, Indiana, who is the legal and rightful owner of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

53.     Erma Dukes-Ellis is a natural person residing in and domiciled in Oakland, California, who is the legal and rightful owner of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

54.     Walter and Karen Earl are natural persons residing in and domiciled in Mount Joy, Pennsylvania, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

55.     Michael and Suzette Ector are natural persons residing in and domiciled in Horseheads, New York, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

56.      Harmon and Shirley Edmond are natural persons residing in and domiciled in Baltimore, Maryland, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

57.      Mark and Teresa Farber are natural persons residing in and domiciled in Fort Wayne, Indiana, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

58.      Rickey and Lynn Farr are natural persons residing in and domiciled in Council Grove, Kansas, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

59.      Johnny and Kellie Fender are natural persons residing in and domiciled in Ellenboro, North Carolina, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

60.      Marquies Fields is a natural person residing in and domiciled in Vienna, Georgia, who is the legal and rightful owner of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

61.      Josef and Mary Fila are natural persons residing in and domiciled in Jamestown, North Carolina, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

62.      Randall and Carolyn Filger are natural persons residing in and domiciled in Ellenboro, North Carolina, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

63.     Barbara Foley is a natural person residing in and domiciled in Grand Island, Florida, who is the legal and rightful owner of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

64.     Celestine Frazier are natural persons residing in and domiciled in Omaha, Nebraska, who is the legal and rightful owner of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

65.     Addie Freytag are natural persons residing in and domiciled in Ellenboro, North Carolina, who is the legal and rightful owner of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

66.     Joseph and Lorene Gagliano are natural persons residing in and domiciled in Islandia, New York, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

67.     Joel and Rose Garhartt are natural persons residing in and domiciled in Saint Lucie, Florida, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

68.     Priscilla Gibson and Angela Marcoux are natural persons residing in and domiciled in Florence, South Carolina, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

69.     Timothy and Sherri Gibson are natural persons residing in and domiciled in Oceana, West Virginia, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

70.     Larry and Jan Gordon are natural persons residing in and domiciled in Dobson, North Carolina, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

71.     Francis and Norma Gorman are natural persons residing in and domiciled in Farmingville, New York, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

72.     John and Frances Greene are natural persons residing in and domiciled in Aurora, Colorado, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

73.     Robert and Eugenia Gruber are natural persons residing in and domiciled in Crossville, Tennessee, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

74.     Douglas and Michelle Guernsey are natural persons residing in and domiciled in Weaverville, North Carolina, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

75.     James and Patricia Gutillo are natural persons residing in and domiciled in Clarence, New York, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

76.     David and Elizabeth Hanauer are natural persons residing in and domiciled in Muncie, Indiana, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

77.     Joseph and Lori Harrah are natural persons residing in and domiciled in Huntsville, Arkansas, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

78.     Christopher Harris and Sharman Gingrich are natural persons residing in and domiciled in Newbury, Massachusetts, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

79.     Elizabeth Hartman is a natural person residing in and domiciled in Elkart, Indiana, who is the legal and rightful owner of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

80.     Claudette Haskins is a natural person residing in and domiciled in Clarence, New York, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

81.     Jerome and Janet Haynes are natural persons residing in and domiciled in Pensacola, Florida, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

82.     Wendell Hill is a natural person residing in and domiciled in Neward, Delaware, who is the legal and rightful owner of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

83.     Carolyn Holloway is a natural person residing in and domiciled in Albuquerque, New Mexico, who is the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

84.     Joel and Laura Holst are natural persons residing in and domiciled in Cedar Park, Texas, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

85.     Gary and Natividad Horton are natural persons residing in and domiciled in Linden, Mississippi, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

86.     Delmer and Patricia Huffman are natural persons residing in and domiciled in Cunningham, Kansas, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

87.     Juanita Hughes is a natural person residing in and domiciled in Viejo, Texas, who is the legal and rightful owner of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

88.     Larry and Jewel Jacobs are natural persons residing in and domiciled in Leighton, Alabama, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

89.     Sidney Janise is a natural person residing in and domiciled in Lafayette, Louisiana, who is the legal and rightful owner of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

90.     John and Karen Jansen are natural persons residing in and domiciled in Milford, Connecticut, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

91.     Willis and Doris Jones are natural persons residing in and domiciled in Adamsville, Alabama, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

92.     Robin Jordan is a natural person residing in and domiciled in Schenectady, New York, who is the legal and rightful owner of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

93.     Jay and Patricia Kasdorf are natural persons residing in and domiciled in Chapel Hill, North Carolina, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

94.     James and Patricia Kelly are natural persons residing in and domiciled in Adamsville, Alabama, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

95.     Kenneth and Edith Keys are natural persons residing in and domiciled in Bolton, Mississippi, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

96.     Matthew and Diana Kraatz are natural persons residing in and domiciled in Vilonia, Arkansas, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

97.     Robert Larson is a natural person residing in and domiciled in Bartlett, Tennessee, who is the legal and rightful owner of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

98.     Joseph and Doreen Lee are natural persons residing in and domiciled in Vilonia, Arkansas, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

99.     Helena Letsch is a natural person residing in and domiciled in Colorado Springs, Colorado, who is the legal and rightful owner of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

100.    Ann and Allison Lewandowski are natural persons residing in and domiciled in Mokena, Illinois, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

101.    Harry and Leverna Lewis are natural persons residing in and domiciled in Philadelphia, Pennsylvania, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

102.    Vincent and Angela Livingston are natural persons residing in and domiciled in Colfax, North Carolina, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

103.    Christopher and Deanna Lynch are natural persons residing in and domiciled in Cerritos, California, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

104.    William and Cheryl Lynch are natural persons residing in and domiciled in Colfax, North Carolina, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

105.    Jim Maguire is a natural person residing in and domiciled in Humphrey, Nebraska, who is the legal and rightful owner of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

106.    Raymond and Betty Makovicka are natural persons residing in and domiciled in Bremerton, Washington, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

107.    Thomas and Nia Marsh are natural persons residing in and domiciled in Bear Creek, North Carolina, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

108.    Howard and Linda Marshall are natural persons residing in and domiciled in Panama City, Florida, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

109.    Donald Martin and Anne Sheals are natural persons residing in and domiciled in Alexandria, Virginia, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

110.    Maryann Mayo is a natural person residing in and domiciled in Agusta, South Carolina, who is the legal and rightful owner of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

111.    Leslie McCoy is a natural person residing in and domiciled in Humphrey, Daphne, Alabama, who is the legal and rightful owner of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

112. Darrell and Janet McDonald are natural persons residing in and domiciled in Alexandria, Virginia, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

113. Jose and Mychel Medina are natural persons residing in and domiciled in Alma, Arkansas, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

114. Larry and Sandra Mercer are natural persons residing in and domiciled in Portsmouth, Virginia, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

115. William and Linda Mercer are natural persons residing in and domiciled in Portsmouth, Virginia, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

116. Earnest Miner is a natural person residing in and domiciled in Yorktown, Virginia, who is the legal and rightful owner of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

117. Julia Morgan is a natural person residing in and domiciled in Staten Island, New York, who is the legal and rightful owner of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

118. Rodger and Melinda Morgan are natural persons residing in and domiciled in Ironton, Ohio, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

119.    Ruth Morin is a natural person residing in and domiciled in Mahomet, Illinois, who is the legal and rightful owner of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

120.    Edward and Karen Morris are natural persons residing in and domiciled in Cottonwood, Alabama who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

121.    Jerome and Althea Morris are natural persons residing in and domiciled in Lincoln, Delaware, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

122.    Joseph and Linda Morrison are natural persons residing in and domiciled in Wells, West Virginia, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

123.    Donald and Delmire Morse are natural persons residing in and domiciled in Portsmouth, New Hampshire, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

124.    Donald and Rose Nelson are natural persons residing in and domiciled in Columbus, Nebraska, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

125.    Pedro and Felipa Nieto are natural persons residing in and domiciled in Victoria, Texas, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

126.    Elvin and Carol Norman are natural persons residing in and domiciled in Youngstown, Ohio, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

127.    Irene Obera is a natural person residing in and domiciled in Freemont, California, who is the legal and rightful owner of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

128.    George Pedrick and Jose Guzman are natural persons residing in and domiciled in San Diego, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

129.    Tamora Pennell is a natural person residing in and domiciled in Kannapolis, North Carolina, who is the legal and rightful owner of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

130.    John and Margaret Petrovic are natural persons residing in and domiciled in Bel Air, Maryland, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

131.    William and Georgia Potaris are natural persons residing in and domiciled in New Port Richey, Florida, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

132.    Joseph and Grace Pratti are natural persons residing in and domiciled in Staten Island, New York, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

133.    Roger and Patricia Quade are natural persons residing in and domiciled in Dubuque, Iowa, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

134.    Johnnie and Ida Quarterman are natural persons residing in and domiciled in Valdosta, Georgia, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

135.    Rose Raney are natural persons residing in and domiciled in Mesa, Arizona, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

136.    Willard and Jackie Raper are natural persons residing in and domiciled in Moore, Oklahoma, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

137.    Corey and Shirley Ray are natural persons residing in and domiciled in Woodway, Texas, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

138.    Anya Rey is a natural person residing in and domiciled in Baltimore, Maryland, who is the legal and rightful owner of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

139.    Normand and Catherine Rheaume are natural persons residing in and domiciled in Woodway, Texas, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

140.    Eric and Gloria Richardson are natural persons residing in and domiciled in Martins Ferry, Ohio, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

141.    Larry Richardson is a natural person residing in and domiciled in Bellevue, Washington, who is the legal and rightful owner of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

142.    Walter and Darlene Richardson are natural persons residing in and domiciled in Murrells Inlet, South Carolina, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

143.    Jamine Rogers is a natural person residing in and domiciled in Sheffield, Alabama, who is the legal and rightful owner of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

144.    Gert and Terry Rohall are natural persons residing in and domiciled in Murrells Inlet, South Carolina, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

145.    William and Janice Russ are natural persons residing in and domiciled in Wichita, Kansas, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

146.    Dan Russell is a natural person residing in and domiciled in Greenbush, Maine, who is the legal and rightful owner of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

147.    Donn and Carolyn Russell are natural persons residing in and domiciled in Palmer, Nebraska, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

148.    Keith and Linda Sadowsky are natural persons residing in and domiciled in Brooklyn Park, Minnesota, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

149.    Edward and Shirley Sanders are natural persons residing in and domiciled in New Orleans, Louisiana, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

150.    Teresita Santiago is a natural person residing in and domiciled in Dix Hills, New York, who is the legal and rightful owner of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

151.    James and Olivia Sellers are natural persons residing in and domiciled in Whitehouse, Texas, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

152.    David and Kathleen Shaefer are natural persons residing in and domiciled in Kirkwood, Missouri, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

153.    Ralph and Marilyn Siegel are natural persons residing in and domiciled in Homosassa, Florida, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

154.     Robert Smith is a natural person residing in and domiciled in Lawrence, Kansas, who is the legal and rightful owner of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

155.     Dough and Eva Solsby are natural persons residing in and domiciled in Homosassa, Florida, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

156.     Mark and Vicky Southwith are natural persons residing in and domiciled in Homosassa, Florida, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

157.     Robert Stewart and Donna Harrison are natural persons residing in and domiciled in Zachary, Louisiana, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

158.     Phillip and Wilma Stocks are natural persons residing in and domiciled in Hartwell, Georgia, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

159.     Marcel Tajchman is a natural person residing in and domiciled in McPherson, Kansas, who is the legal and rightful owner of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

160.     John and Patricia Thompson are natural persons residing in and domiciled in Hartwell, Georgia, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

161.     Alexander Umana and Rosa Umana are natural persons residing in and domiciled in Ozone Park, New York, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

162.     Luis and Clara Villegas are natural persons residing in and domiciled in Lowell, Arkansas, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

163.     Michael and Patricia Voorhees are natural persons residing in and domiciled in Hartwell, Georgia, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

164.     Ronald Walker is a natural person residing in and domiciled in Boomer, West Virginia, who is the legal and rightful owner of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

165.     Ronald and Glinder Walker are natural persons residing in and domiciled in Bettendorf, Iowa, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

166.     Jerry and Sheila Ward are natural persons residing in and domiciled in Louisville, Kentucky, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

167.     Lynn Watts is a natural person residing in and domiciled in Huntsville, Alabama, who is the legal and rightful owner of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

168.    Thomas and Joann Weimer are natural persons residing in and domiciled in Woodhaven, New York, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

169.    Randy Wheeler is a natural person residing in and domiciled in Wingo, Kentucky, who is the legal and rightful owner of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

170.    Johnnie Wiedeman and Maureen Dunn are natural persons residing in and domiciled in Mount Ida, Arkansas, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

171.    Harold and Margretta Williams are natural persons residing in and domiciled in Hannibal, Missouri, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

172.    Wynard and Tiffany Williams are natural persons residing in and domiciled in Macon, Georgia, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

173.    Norbert and Deborah Wnukowski are natural persons residing in and domiciled in St. Clair Shores, Michigan, who are the legal and rightful owners of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

174.    David Yarborough is a natural person residing in and domiciled in West Columbia, South Carolina, who is the legal and rightful owner of a timeshare interest, under Westgate Resorts, Ltd., Central Florida Investments, Inc., and/or Westgate Resorts, Inc.

**Defendants:**

175.    Defendants are Westgate Resorts, Ltd., L.P., Central Florida Investments, Inc., Westgate Resorts, Inc., Westgate GV Sales & Marketing, LLC, Westgate Vacation Villas, LLC, and CFI Resorts Management, Inc. (collectively referred to herein as "Westgate"[1]).

176.    Defendant Westgate Resorts, Ltd., L.P. ("Westgate Resorts, Ltd.") is an active limited partnership formed and operating in Florida under the name Westgate Resorts, Ltd., with an initial filing date of April 14, 1999, a principal office of 5601 Windhover Drive, Orlando, Florida 32819.  Its Missouri registered agent is Corporation Service Company, 221 Bolivar Street, Jefferson City, MO 65101.

177.    At all times relevant to this lawsuit, Westgate Resorts, Ltd. operated the Westgate Smoky Mountain Resort at Gatlinburg (the "Smoky Mountain Resort"), at 915 Westgate Resorts Road, Gatlinburg, Tennessee 37738.

178.    At all times relevant to this lawsuit, Westgate Resorts, Ltd. operated the Westgate Branson Woods Resort at Branson (the "Branson-Woods Resort"), at 2201 Roark Valley Road, Branson, MO 65616.

179.    At all times relevant to this lawsuit, Westgate Resorts, Ltd. operated the Westgate Branson Lakes Resorts at Hollister (the "Branson-Lakes Resort"), at 750 Emerald Point Drive, Hollister, Missouri 65672.

---

[1] Plaintiffs allege claims against all Defendants as alter egos of one another, as explained more fully herein. To the extent any Defendant had a discrete, distinguishable role in causing the injuries alleged herein, such information is exclusively in Defendants' possession.

180.    At all times relevant to this lawsuit, Westgate Resorts, Ltd. operated the Westgate Las Vegas Resorts at Las Vegas (the "Las Vegas-Resort"), at 3000 Paradise Rd, Las Vegas, Nevada 89109.

181.    At all times relevant to this lawsuit, Westgate Resorts, Ltd. operated the Westgate Myrtle Beach Oceanfront Resorts at Myrtle Beach (the "Myrtle Beach-Resort"), at 415 South Ocean Boulevard, Street 2, Myrtle Beach, South Carolina 29577.

182.    At all times relevant to this lawsuit, Westgate Resorts, Ltd. operated the Westgate Orlando Resorts at Orlando (the "Orlando-Resort"), at 9500 Turkey Lake Rd, Orlando, Florida 32819.

183.    Defendant Westgate Resorts, Inc. is a Florida corporation with its principal place of business at 5601 Windhover Drive, Orlando, FL, 32819.  It is the general partner of Westgate Resorts, Ltd.

184.    Defendant Westgate GV Sales & Marketing, LLC, is a Florida limited liability company with its principal place of business at 5601 Windover Drive, Orlando, FL 32819.

185.    Defendant Central Florida Investments, Inc. ("CFI") is a Florida corporation with its principal place of business at 5601 Windhover Drive, Orlando, FL, 32819.  On its website, Westgate Resorts, Ltd. states that it operates as a subsidiary of CFI.

186.    Defendant CFI Resorts Management, Inc. ("CFI Resorts Management") is a Florida corporation with its principal place of business at 5601 Windhover Drive, Orlando, FL, 32819. It is the managing entity that manages the Resort.

187.    Defendant Westgate Vacation Villas, LLC is a Florida limited liability company with its principal place of business at 5601 Windhover Drive, Orlando, FL, 32819. It is the general manager of Westgate Resorts, Ltd.

188.    CFI, CFI Resorts Management, Westgate Resorts, Inc., and Westgate Vacation Villas, LLC all have the same President/Secretary, David A. Siegel, and the same Treasurer/Chief Financial Officer, Thomas F. Dugan.

189.    At all times herein mentioned, each of the Defendants was the agent, servant, partner, aider and abettor, co-conspirator and/or joint venture of each of the other Defendants and was at all times operating and acting within the purpose and scope of said agency, service, employment, partnership, conspiracy and/or joint venture and rendered substantial assistance and encouragement to the other Defendants, knowing that their collective conduct constituted a breach of duty owed to Plaintiffs and injured Plaintiffs.

190.    At all times herein mentioned, Defendants and each of them, were fully informed of the actions of their agents and employees, and thereafter no officer, director or managing agent of Defendants repudiated those actions, which failure to repudiate constituted adoption and approval of said actions and all Defendants and each of them, thereby ratified those actions.

191.    There exists and, at all times herein mentioned, there existed a unity of interest in ownership between certain Defendants and other certain Defendants such that any individuality and separateness between the certain Defendants has ceased and these Defendants are the alter ego of the other certain Defendants and exerted control over those Defendants.  Adherence to the fiction of the separate existence of these certain Defendants

34

as entities distinct from other certain Defendants will permit an abuse of the corporate

privilege and would sanction a fraud and/or would promote injustice.

## FACTUAL ALLEGATIONS

**The Timeshare Industry**

1.      **Repeated Sales of the Same Property Drive the U.S. Timeshare Industry**

192.    The U.S. timeshare industry was founded in the early 1970s, a period of

economic stagnation and soaring energy costs, when hotel and resort developers struggled to

sell full ownership condominium properties. Instead of selling an actual condominium,

developers realized, they could sell "ownership shares" to many customers, each of which

theoretically gives an owner the right to use the property (or a similar property) for certain

amounts of time per year.

193.    This simple notion—dividing one condominium or resort property into

"ownership shares" and selling it over and over again, to dozens of different buyers—is the

fundamental concept that has given rise to the profitable modern timeshare industry. By

selling a vacation timeshare unit incrementally, a timeshare developer makes far more

money than if it sold the same unit to one buyer for the market price.  As an illustration, a

timeshare developer can build 150 condominiums, each of which might sell for $200,000 on

the open market; using a timeshare approach, the developer could sell two-week timeshares

in each unit, for a total of 26 "timeshares," for, say, $20,000 each.  By using the timeshare

scheme, the developer's investment brings a return of $520,000—2.6 times greater than the

$200,000 it would have grossed selling to one buyer.  (Westgate takes this scheme several

steps farther: it sells many more than 26 timeshares in each unit, exponentially increasing its profits while knowing that the unit will rarely or never be available for purchasers to use them.)

194.    Timeshare business is booming. According to the Association of Vacation Owners, the size of the annual timeshare market is $9.2 billion, with 9.2 million American households owning some form of timeshare....In 2015, approximately 9.2 million American households owned timeshares.  There were 1,547 timeshare resorts in the United States, with approximately 200,720 units available to be divided up and sold repeatedly.  The timeshare industry sold $8.6 billion worth of timeshares to consumers in 2015, with an average sales price of $22,240 and average maintenance fees of $920. *See* Howard Nusbaum, "Local Perspective on the Global Timeshare Industry," September 21, 2016, *available at* http://www.rdoconference.org/wp-content/uploads/2016/09/a-global-perspective-howardnusbaum.pdf; see also Gretchen Morgenson, "The Timeshare Hard Sale Comes Roaring Back," *New York Times*, January 24, 2016, *available at* https://www.nytimes.com/2016/01/24/business/ diamond-resorts-accused-of-using-hard-sell-to-push-time-shares.html.

195.    The industry is currently experiencing a period of substantial growth. Timeshare sales volume has increased by more than 33% since 2011, the industry reports, an average of 7% annually. In the most recent year for which data is available, sales volume rose from $8.6 billion 218 in 2015 to $9.2 billion in 2016, a nearly seven percent increase. This is part of a seven-year growth trend: in 2015, sales volume increased by nearly 9%, the

36

second-largest percentage increase since the housing market collapse of 2008 caused the Great Recession.

196.    While privately held corporations like Westgate exist in the timeshare marketplace, the sector is increasingly dominated by large, often publicly traded corporations that depend on the industry's inflated profit margins.

197.    These corporations, including Westgate, also loan money to consumers to finance the purchase.  They then convert the timeshare promissory notes into securities that are rated and sold in the financial markets.  In 2017, for example, Westgate issued $132,500,000 and $42,500,000 in Class A and Class B "Timeshare Collateralized Notes," respectively.  This year, Westgate issued another $197,850,000 in secured timeshare notes. Since 1992, it has sold approximately $3.4 billion in notes in the securitization market.

198.    The timeshare industry's record profits are driven by sales of ownership shares, not its customers' use and enjoyment of their properties. In fact, a timeshare business makes money every time someone makes a down payment or monthly payment on a timeshare, including paying steep annual "maintenance fees," but when people use the properties, it prevents the timeshare developer from renting that property to another customer or using it to entice a prospective purchaser to buy a timeshare.  Selling units to new customers and selling nicer units to existing customers is the lifeblood of the timeshare industry.

199.    The timeshare business has been a breeding ground for fraudulent sales tactics like those employed by Westgate as detailed herein.  Since its founding in the early

1970's, the industry has relied on "sneaky come-ons" to trap consumers in "multi-hour

presentations complete with high-pressure sales tactics."  Consumer Reports, "The

Timeshare Comes of Age," Feb. 23, 2016, available at

http://www.consumerreports.org/travel/the-timeshare-comes-of-age/. In recent years,

lawsuits and news reports have documented "high pressure sales tactics involving deliberate

lies and misrepresentations to get people to buy more timeshare 'points.'" New York Times,

"My Soul Feels Taller: A Whistleblower's $20 Million Vindication,"

https://www.nytimes.com/2016/11/25/business/my-soul-feels-taller-a-whistle-blowers-

million-vindication.html.  Among the tactics used by one prominent timeshare business:

"TAFT" days, where employees were encouraged to "Tell Them Any Frigging Thing" to

make a sale, as long as they didn't put it in writing.  Id.

200.    Furthermore, the industry relies on owners' inability to resell their timeshare

properties, despite telling prospective buyers that they are purchasing an asset that will only

appreciate in value.  Across the industry, timeshare companies refuse to buy back timeshare

properties from customers who no longer wish to own them.  As Diamond Resorts, a major

industry player, noted in an annual financial filing, if the resale market "were to become

more organized and liquid," the resulting availability of vacation units "could adversely

affect our sales and our sales prices."  Gretchen Morgenson, "The Timeshare Hard Sale

Comes Roaring Back," New York Times, January 24, 2016, available at

https://www.nytimes.com/2016/01/24/business/diamond-resorts-accused-of-using-hard-sell-

to-push-time-shares.html.  Not only are some timeshare businesses known for fraudulent

sales tactics, once they convince owners to purchase a property, they trap them in a

valueless resale market, leaving them with few options but to continue making their monthly mortgage and maintenance fee payments.

201.    Timeshare businesses also profit from the significant "maintenance fees" they charge each owner.  These fees are supposed to pay for property taxes, landscaping, management, and insurance, and must be paid by the owner even after the full purchase payment is satisfied.  Consumer Reports, "The Timeshare Comes of Age," Feb. 23, 2016, available at http://www.consumerreports.org/travel/the-timeshare-comes-of-age/.  To the timeshare industry, these maintenance fees are a profit center, and the leading vacation timeshare trade group celebrates that maintenance fees have increased 4% percent per year on average since 2010.  In 2015, the average timeshare owner paid $920 in maintenance fees per property.  See Howard Nusbaum, "Local Perspective on the Global Timeshare Industry," September 21, 2016, available at http://www.rdoconference.org/wp-content/uploads/2016/09/a-global-perspective-howard nusbaum.pdf; see also American Resort Development Association, "A Look At Timeshare" Infographic, http://vacationbetter.org/wp-content/uploads/2015/07/aif_15SOI Infographic_7.14.15.jpg.

202.    In recent years, regulators in jurisdictions across the United States have begun enforcing consumer protection laws against the timeshare industry:

    a.    Tennessee Attorney General Herbert H. Slatery III announced a $3 million settlement with timeshare company Festiva due to fraudulent and deceptive tactics that violated the Tennessee Consumer Protection Act, https://www.tn.gov/attorneygeneral/news/pr16-04;

b.      Former New York Attorney General Eric Schneiderman halted sales

at the Manhattan Club in New York due to allegedly fraudulent sales

practices, citing "high-pressure sales tactics" and a "bait-and-switch

timeshare scheme," https://ag.ny.gov/press-release/ag-schneiderman-

announces-court-order-barring-sales-manhattan-club-timeshare-hotel;

c.      Diamond Resorts International has been sued by owners' groups at

multiple resorts, including Diamond Monarch, Hawaii at Poipu, and ILX,

alleging fraud and intimidation, Courthouse News Service, "Timeshare Giant

Wants Class Action Dumped," January 7, 2016, available at

https://www.courthousenews.com/timeshare-giant-wants-class-action-

dumped/; Timesharing Today, "Diamond Resorts Hit With Lawsuit by Poipu

Point Owners," May/June 2012, available at

http://www.tstoday.com/members/magazine/issue123/7-poipu%20point.pdf;

and Courthouse News Service, "Couple Claim Timeshare Group Rolled

Them," March 12, 2015, available at

https://www.courthousenews.com/couple-claim-timeshare-group-rolled-

them/.

203.    Federal authorities have begun cracking down on timeshare businesses,

including Westgate specifically.  The U.S. Consumer Financial Protection Bureau ("CFPB")

has recently investigated Westgate, according to the CFPB's recent decision regarding a

civil investigative demand,

to determine whether persons involved in the sale and financing of timeshares have engaged in, or are engaging in, acts or practices in violation of Sections 1031 and 1036 of the [Consumer Financial Protection Act], 12 U.S.C. §§ 5531 and 5536, the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692, et seq., the Electronic Funds Transfer Act, 15 U.S.C. § 1693 et seq., the Fair Credit Billing Act (FCBA), 15 U.S.C. § 1666 et seq., their implementing regulations, or any other Federal consumer financial law.

Decision and Order, In the Matter of Westgate Resorts, Ltd., 2015-MISC-WESTGATE RESORTS, LTD-0001, (U.S. Consumer Financial Protection Bureau March 11, 2016) available at http://files.consumerfinance.gov/f/201603_cfpb_decision-and-order-on-petition-by-westgate-resorts-ltd-to-modify-or-set-aside-civil-investigative-demand.pdf

204.     And the Tennessee Court of Appeals recently affirmed (with modification) a punitive damages award in a case filed by Tennessee timeshare owners against Westgate for defrauding them and hiding required disclosures from them.  See *Overton v. Westgate Resorts, Ltd., L.P.*, No. E2014-00303-COAR3CV, 2015 WL 399218, at *7 (Tenn. Ct. App. Jan. 30, 2015) ("Westgate engaged in intentional and fraudulent conduct and that Westgate willfully violated both the Tennessee Time-share Act and the Tennessee Consumer Protection Act."), appeal denied (June 15, 2015), cert. denied, 136 S. Ct. 486 (2015), available at http://tncourts.gov/sites/defauslt/files/overton.pdf.

B.     **Westgate's Failure to Disclose Material Facts to Timeshare Purchasers**

205.     To effectuate its scheme detailed herein, Westgate uses high-pressure sales tactics to induce prospective purchasers to buy into its vacation timeshare program while failing to disclose material and legally required information to them.  Among other material omissions, Westgate's scheme includes the following elements:

41

a.      In Missouri and Tennessee, a timeshare estate is an interest in real property, and a timeshare use is a contractual right of exclusive occupancy. Timeshare sales and closing agents are licensed and /or regulated by the State.  As part of their scheme, Defendants fail to adequately train or to supervise their sales agents, and, in fact, encourage their sales agents to utilize high-pressure sales tactics which violate the Missouri Merchandising Practices Act, the Missouri Time-Sharing Regulation, the Tennessee Timeshare Act, the Tennessee Real Estate Broker Licensing Act, and the common law.

b.      The Missouri Time-Sharing Regulation, the Tennessee Timeshare Act and the regulations of the Tennessee Real Estate Commissions require timeshare developers and sales agents to deliver various disclosures to timeshare purchasers.  As part of their scheme, Defendants provide their sales and closing agents with a folio to give to purchasers with the purchasers' documentation; however, the folios provided by the Defendants contain a "secret pocket" which Defendants know that their sales and closing agents often use to conceal the required disclosures, including disclosures regarding the purchaser's statutory right to rescind their purchase, in violation of Missouri and Tennessee law, Mo. Ann. Stat. § 407.620 and Tenn. Code. Ann. § 66-32-112(9).

c.      The Missouri Time-Share Regulation, Tennessee Time-Share Act, Tennessee Real Estate Broker Licensing Act contemplate that

42

purchasers of a timeshare should receive clear and accurate information about their purchase.  As part of their scheme, the Defendants fail to adequately disclose to purchasers that they are not purchasing a share in a specific unit but are instead buying into a "floating use plan"; they fail to adequately disclose how the "floating use plan" actually works; and they fail to adequately disclose that the Defendants may delay delivery of a deed to the purchasers for a period of years;

        d.     As part of their Scheme, the Defendants fail to disclose to purchasers that because Westgate oversells and artificially restricts the availability of Resort properties (by, for example, renting the properties to non-owners, using the properties as model units, selling to purchasers when no unites are available to be deeded, and closing units for maintenance), they will not be able to use their timeshare purchase as advertised or as would be reasonably expected – or sometimes at all – in violation of the Missouri Time-Sharing Regulation  and the Tennessee Time-Share Act's requirements that timeshare developers must disclose restrictions on use or occupancy, develop and use reasonable arrangements to manage the timeshare program, and avoid making misleading or deceptive representations about it.

206.   Westgate sales agents pressure purchasers to sign a series of complex and misleading legal documents without giving purchasers the opportunity to read—or in some cases, see—the documents they are signing (in some cases electronically).  Only months later, when the new timeshare owners attempt to reserve vacation time in "their" unit, do

they learn that Westgate sold them something entirely different than what Westgate told them they had purchased.

207.     Westgate specifically trains its sales agents to make misrepresentations and omissions during the sales process.  Westgate Resorts Vice President Richard Siegel has been captured on video telling sales agents to "lie" in order to complete a sale:  "You should own at least one week yourselves—and if you don't, lie and say you do!  Don't let these people leave here without buying something! Something!" he said.  "100% of the people we are talking to are—it's not a nice word, but we call 'em mooches. They're coming in for a sales presentation on their vacation for a free gift.  So, we train our sales' people on how to take someone greedy like that and get them to buy today.  We do 100% of our sales on the first day…They will not buy today if they don't get a 'great deal' [making air quotes]—if they don't believe that they're getting a great deal…. Timesharing you sell every unit 52 times because you sell it by the week."[2]

## 1.     Westgate Uses High-Pressure Sales Tactics to Trick Consumers into Making Purchases They Do Not Understand

208.     To effectuate their scheme, Westgate agents approach vacationers on the street, in restaurants, and at other public areas.  They offer them free tickets to local attractions, discounts on timeshare purchases, and vouchers for free meals in order to entice them to take a tour of the Resort.

---

[2] *The Queen of Versailles* (2012), excerpt available at https://www.youtube.com/watch?v= W9G9RD5fnsw.

209.    Once these vacationers arrive at the Resort for the tour, Westgate agents subject them to a high-pressure sales pitch—in some instances lasting as long as eight hours—designed to ensure that they do not leave without purchasing a timeshare property. Westgate agents attempt to persuade prospective purchasers by telling them that a timeshare is cheaper than paying for future vacations, but that they must act immediately in order to take advantage of supposedly discounted prices.

210.    As one of several hundred of online commenters said about the "WESTGATE SCAM":

> The place was beautiful, but they trick you into thinking they are giving you a tour and turned into a 3-hour high-pressure sales pitch in a tent. Finally, we agreed to the lowest deal 3 hours later. We were never getting out of there without agreeing.

> Consumer Affairs, "Westgate Resorts,"

> https://www.consumeraffairs.com/travel/westgate.html

211.    The high-pressure sales tactics do not stop once Westgate completes a sale: existing owners face constant pressure from Westgate agents and employees to upgrade to nicer units.  For example, Westgate assigns owners a "concierge," supposedly to assist them with booking and other transactions, but in fact the concierge is a sales person who pressures owners to "upgrade" their prior purchase—selling back their initial property and purchasing a nicer, larger, or deluxe property.

**2.    <u>Westgate Fails to Tell Owners that They Cannot Reasonably Use and Enjoy Their Property</u>**

212.    Westgate represents to prospective purchasers that as timeshare owners, they will have no difficulty using their timeshare unit whenever they want, provided they book with at least 24 hours' notice.  On its website, Westgate states that owners will enjoy "[a]n easy, flexible floating program where you can choose where, when, and how you want to vacation—the vacation possibilities are endless."

213.    In reality, Westgate fails to disclose that timeshare owners are routinely unable to book units in the Resort with as much as 12 months' notice—the earliest Westgate allows owners to reserve the use of their timeshare.  Timeshare owners have made repeated attempts to book a stay during their allotted time, only to be told by Westgate officials that there is no availability at the Resort.  As a result, many Class Members have been entirely unable to use their timeshare property for an entire year.

214.    Westgate specifically fails to disclose to purchasers that tens of thousands people own timeshare properties at the 1,004-unit Resort, with some owners "owning" multiple "weeks," limiting each owner's ability to use and enjoy the timeshare property for which he or she paid.

215.    Likewise, Westgate fails to disclose to purchasers that it sets aside a substantial number of units in the Resort as vacation rentals, further restricting the supply of units available for timeshare owners to use.  In other words, Westgate chooses to rent units out—including the specific units it lists in deeds of sale to timeshare owners—instead of making them available to owners.  In some instances, as described more fully below, Westgate has told a timeshare owner hat there is no availability in the unit type listed on his or her deed, but the owner then finds the same unit type listed on Westgate's website as a

vacation rental, with proceeds going to Westgate.  Furthermore, Westgate does not inform purchasers that certain purchasers may not receive a deed, for a period of years, but will still be able to make reservations, thereby diluting the availability for existing owners.

216.    Finally, Westgate does not inform purchasers that it sets aside large numbers of demonstration units for the near-constant tours and sales efforts it uses to generate new timeshare business.  Because the profitability of Westgate's timeshare business largely depends on sales of new and upgraded units, the Resort devotes substantial resources to high-pressure sales tours, during which dozens to hundreds of prospective purchasers are brought each day through many of the nicest timeshare units at the Resort.  None of these units are available to the owners who have legitimately paid for the right access to them.

3.      **Westgate Fails to Adequately Inform Purchasers that They Are Not Purchasing a Share in a Specific Unit**

217.    Westgate sales agents give purchasers the impression that they are purchasing the right to use a specific unit at the Resort.  In actuality, they are participating in Westgate's "Floating Use Plan," which gives owners the right to use a certain type of unit, subject to availability.  And units are rarely, if ever, available to "owners," as advertised or expected.

218.    The purchase documents Westgate drafts and requires purchasers to sign lead them to believe that they are purchasing a share in a specific unit in the property.  For example, the Warranty Deeds drafted by Westgate and signed by Plaintiffs state that they have the "right to occupy, pursuant to the Plan," specific units at the Resort.  However, in

the fine print of Westgate's Floating Use Plan, purchasers relinquish their rights to possess and use specific units at the Resort.  Westgate sales agents do not disclose this to purchasers during the high-pressure sales process.

219.    Westgate does not even give owners the right to use similar units at the Resort.  Despite making repeated representations in the high-pressure sales pitches that owners can book their specific unit, or an identical one, for use anytime in the time period purchased, Westgate routinely prevents owners from booking the unit type.  In this way, Westgate's "floating use" plan, which it does not adequately describe to timeshare purchasers, fails to provide purchasers reasonable access to their timeshares.

4.    **Westgate Uses a "Secret Pocket" to Conceal Legally Required Disclosures from Purchasers**

220.    To protect consumers from abusive practices like those employed by Westgate, Tennessee law requires a timeshare developer to make certain disclosures to purchasers, including informing them of their right to rescind the contract after leaving the high-pressure sales pitch.  Westgate routinely uses a folio containing a secret pocket that enables its commission-based closing offers to conceal the disclosures so consumers will not find them and try to rescind their purchase.

221.    Specifically, the Missouri Time-Sharing Regulation, Mo. Ann. Stat. § 407.625, requires the timeshare developer prior to the execution of any contract between the purchaser and the timeshare developer, to deliver to the purchaser certain information, and

the purchaser shall certify, in writing, to the receipt of such written information. As relevant

to this lawsuit, the required information includes:

> a. A complete and accurate description of all limitations, restrictions, or
> priorities employed in the operation of the exchange program, including, but
> not limited to, limitations on exchanges based on seasonality, unit size, or
> levels of occupancy, expressed in boldfaced type, and, in the event that such
> limitations, restrictions, or priorities are not uniformly applied by the
> exchange program, a clear description of the manner in which they are
> applied;

> b. The number of units in each property participating in the exchange
> program which are available for occupancy and which qualify for
> participation in the exchange program, expressed within the following
> numerical groupings: 1-5, 6-10, 11-20, 21-50, and 51 and over; and

> c. The number of owners with respect to each time-share plan or other
> property which are eligible to participate in the exchange program expressed
> within the following numerical groupings: 1-100, 101-249, 250-499, 500-
> 999, and 1,000 and over; and a statement of the criteria used to determine
> those owners who are currently eligible to participate in the exchange
> program;

> d. Mo. Ann. Stat. § 407.625. Violation of any of these provisions is a
> class A misdemeanor. Mo. Ann. Stat. § 407.630.

222.     Similarly, the Tennessee Time-Share Act, Tenn. Code Ann. § 66-32-101, et seq., requires a timeshare developer to provide each purchaser a Public Offering Statement. The Public Offering Statement must "fully and accurately disclose" to the purchaser that he or she has the right to rescind the contract within a designated amount of time.  Specifically, it must include:

       a.     A statement that within ten (10) days from the date of the signing of the contract made by the purchaser, where the purchaser shall have made an on-site inspection of the time-share project prior to the signing of the contract of purchase, and where the purchaser has not made an on-site inspection of the time-share prior to the signing of the contract of purchase fifteen (15) days from the date of the signing of the contract, the purchaser may cancel the contract for the purchase of a time-share interval from the developer.

       b.     Tenn. Code. Ann. § 66-32-112(9).  A timeshare purchase contract is voidable until the purchaser has received the Public Offering Statement. Tenn. Code Ann §66-32-114.  Corresponding state regulations require that this same rescission language be found on the purchase contract.

223.     It is Westgate's standard practice to give each new purchaser who buys a vacation timeshare at the Resort a black folio.  Generally made of black faux leather, the folio zips shut and has numerous readily visible pockets on the outside and on the inside. There is room for documents to simply be placed inside without being in any pocket, since the entire folio zips shut.  The black folio contains Westgate's name and logo on the inside.

224.    Notwithstanding Westgate's duty to provide each purchaser a Public Offering Statement and purchase contract disclosing the purchaser's right to rescind, Westgate provides its commission-based closing agents with the folio containing the secret pocket, knowing that those closing agents often withhold and conceal this information from purchasers by hiding it in the secret pocket.  The secret pocket is not readily ascertainable to a reasonable person.

225.    Westgate's commission-based sales representatives routinely do not inform purchasers, including at various times Class Members, that the Public Offering Statement and purchase contract are concealed within the secret pocket.  Therefore, while purchasers have technically been given the Public Offering Statement and purchase contract, they do not know they have it and are not told about their right to rescind.  In this way, Westgate's concealment prevents purchasers from exercising their right to rescind the contract.  See generally Paul Brinkmann, "Westgate Resorts denies hiding cancellation documents," Orlando Sentinel (Sept. 30, 2015), available at https://www.orlandosentinel.com/business/brinkmann-on-business/os-westgate-resorts-cancellation-20150930-post.html.

**5.    Because the Resort is Oversold, Westgate Fails to Deliver Deeds to Owners**

226.    Westgate routinely fails to deliver warranty deeds to owners because it sells more timeshare properties than the fractional interests it possesses, leaving it without sufficient deeds to provide owners.

227.    When purchasers buy a timeshare property at the Resort, the warranty deed should be recorded by Westgate with the Sevier County Register of Deeds.  Recording the warranty deed protects purchasers from title claims by third parties, and conversely, the failure to properly record the warranty deed leaves purchasers vulnerable to such claims.

228.    Purchasers of timeshare properties at the Resort are told that Westgate will record their Warranty Deed and send them a copy.  Westgate agents do not tell purchasers that buried in fine print, Westgate asserts that it can delay assigning a unit and recording the deed for up to three years.  Nor does Westgate tell purchasers that in some cases, it has not recorded their deed.  As a result, purchasers reasonably believe that their property transaction will be duly recorded, and their real property interest is protected from claims by third parties.

229.    Westgate's routine failure to record warranty deeds further evidences Westgate's pattern and practice of overselling the Resort: it cannot record and deliver deeds because it sells more fractional interests in real property than actually exist.  Westgate's attempt to remedy this failure with hidden contract language only demonstrates that Westgate is in the business of defrauding its customers.

## <u>GENERAL ALLEGATIONS COMMON TO PLAINTIFFS</u>

230.    All Plaintiffs attended Westgate sales presentations where they either bought a new timeshare membership or upgraded their existing Westgate timeshare membership.

231.    Plaintiffs subsequently learned the representations made by the Westgate agents were false. Plaintiffs now feel lied to and misled.

52

232.     As part of the various sales presentations, Plaintiffs are taken on a tour. Plaintiffs were shown a luxury suite which was represented by Westgate agents as what they were purchasing, but that later learned was not available at their level of ownership.

233.     Westgate agents told Plaintiffs that they would always get to stay at their first choice of property, that making reservations would never be a problem, and they could travel to any part of the world.

234.     Westgate agents would assure Plaintiffs that they could easily vacation anywhere in the world by signing up them up though the RCI or Interval International exchange programs. However, the Westgate agents never disclosed to Plaintiffs that they would have to pay an additional membership fee to take advantage of the exchange programs.

235.     Plaintiffs are often not able to use the property they thought they were purchasing.

236.     Plaintiffs have found that making reservations is difficult every time with many issues that arise each time, with a reservation process that is confusing and inconsistent.

237.     Westgate agents will often tell Plaintiffs that they cannot make a reservation at the property they purchased because it is always full, or that it is not possible to stay in those rooms because of the type of contract they currently have.

238.     Upon arriving at the resort, Plaintiffs often discover they had been assigned a different room than the one they believed they "owned." The room they were assigned to was one of noticeably lesser quality.

239.     When Plaintiffs complain, Westgate agent informed them that their room and all others were booked.

240.     Plaintiffs also promised by Westgate agents at their purchase that they would have parking space assigned to them, but find on their arrival that anyone can use any parking space.

Plaintiffs are often forced to park outside the resort perimeters because there was no parking space available. Addition, Westgate employees often use the parking spots that were supposedly reserved for Plaintiffs.

241.    Plaintiffs feel lied to because the Westgate agents they had purchased the ownership from told them they had the right to use the timeshare they paid for and that they would always be assigned to their purchased unit.

242.    If Plaintiff complain regarding their treatment, Westgate agents would offer to upgrade to their status, but only if they paid additional money to join Interval International or the RCI exchange program.

243.    Additionally, every time Plaintiffs have been able to reserve and utilize their timeshare, Westgate agents have told them that they were required to go to an owner update meeting. The Westgate agents explain that they had to attend the owners update meeting because, as an owner, it was their duty to be informed about the latest changes. However, all the owners meeting they have attended have turned out to be another sales presentation.

244.    On many occasions where Plaintiffs were able to utilize reservations, they found the rooms dirty, there was no housekeeping service available, bug infested, and had to clean the room themselves.

245.    Plaintiffs found the room they were able to stay at was below the standards of what was represented to them at the sales presentation and they learned they could not get a better room unless they upgraded rooms each year.

246.    In regards to the Plaintiffs who were upsold, Westgate agents informed them that such presentations are "mandatory" owners' meetings.

247.     At the upsell meetings, Plaintiffs are often told that they must upgrade right away because their building was scheduled for maintenance and they would not be able to use it until it was finished. Plaintiffs felt that the only choice to save their investment was by signing the upgrade.

248.     As part of the upsell presentations, Westgate agents would often inform those Plaintiffs that something was purportedly "wrong" with their contracts and convince them to sign an even more onerous contract that they would be obligated to.

249.     Westgate agents told Plaintiffs their family members and friends could use the timeshare for free during their purchased week.

250.     Instead, Plaintiffs had to pay additional fees to let family and friends use their membership.

251.     Westgate agents told Plaintiffs they were purchasing real property that could be sold later.

252.     Plaintiffs reasonably believed the deed that was recorded was evidence that they had purchased an interest in real property.

253.     Westgate agents told Plaintiffs they would be able to rent their timeshare out for a profit, making more than enough to pay for both their maintenance fees and mortgage payments. The Westgate agent promised Plaintiffs that Westgate has a special department ready to help them rent their timeshare. The Westgate agent assured them that the process of renting was a very simple procedure.

254.     However, Plaintiffs later found out that Westgate will not help them rent their timeshare and no Westgate agent is available to assist them.

255.    Westgate agents told Plaintiffs that maintenance fees were fixed, would never increase, or only increase slightly, if at all.

256.    Plaintiffs' maintenance fees have increased substantially over the last three years.

257.    Westgate agents told Plaintiffs that ownership was much cheaper than taking an independent vacation to the resort.

258.    It is cheaper for Plaintiffs to book stays at the resorts from other online booking websites.

259.    Westgate agents told Plaintiffs that their timeshare purchase was an investment that would increase in value over time.

260.    Contrary to the value of the property increasing, Plaintiffs were forced to upgrade to maintain their level of reservations because their ownership had devalued.

261.    Increase, instead of the value increasing, similar properties resell on eBay for $1.

262.    Plaintiffs felt pressured to take the deal in a presentation that lasted several hours.

263.    Plaintiffs were not offered any food during their time at the presentation

264.    To increase the pressure at the sales presentation, Plaintiffs are alternatively confronted by three Westgate agents.

265.    If a prospective sale refuses to buy, the Westgate agents began getting visibly angry and raising their voices.

56

266.    Westgate agents told Plaintiffs that their purchase was a special deal that was only available that day. Plaintiffs were told that if they bought the Westgate timeshare that day, they would get a discounted price.

267.    Plaintiffs were told that being a Westgate timeshare property owner entitled them to benefits and access which was limited exclusively to Westgate timeshare owners only.

268.    Westgate agents offered Plaintiffs free gifts, such as a "free" week in Orlando, Florida, or a "free" cruise, but were never actually given the gift of found later there was an additional cost to claim the gift that they would have to pay themselves.

269.    Westgate agents told the Plaintiffs that they could always later sell the timeshare later and that Westgate had buyers waiting.

270.    Westgate agents told the Plaintiffs that if they wanted to sell, they should go back to Westgate who would give them the best deal.

271.    Additionally, Plaintiffs have been charged Special Assessments for remodeling units they do not even own.

272.    If Plaintiffs explained that they could not afford to purchase the timeshare, Westgate agents would tell Plaintiffs they could not leave until they spoke with the manager. After waiting for an extended period of time, the manager would arrive "find a way" for them to afford the purchase.

273.    When Plaintiffs were unable to meet normal lending criteria, Westgate agents would devise special payment arrangements so Plaintiffs would still sign the contract to purchase the timeshare.

274.    Westgate agents at the purchase told them they could refinance the timeshare at a lower rate later, but ty later learned that banks will not refinance timeshares. Agents at

the Westgate resort later told them that they are not responsible for what the Mitchells were told in the sales presentation.

275.     Plaintiffs are not reasonably given any information about the recission period, exiting the time share, or that there was a statutorily required grace period for getting out.

276.     In cases where Westgate agents did tell Plaintiffs that they had a legal right to rescind or cancel their purchase within three days, Westgate agents refused to explain how to execute the same.

## STATUTES OF LIMITATION, FRAUDULENT CONCEALMENT, AND ESTOPPEL
### Discovery Rule

277.     The causes of action did not accrue until Plaintiffs discovered, or could have discovered with reasonable diligence, the facts omitted and/or concealed by Westgate.  Plaintiffs had no realistic ability to discern the true nature and value of their timeshare property purchases because Westgate's subsequent actions and omissions defined Plaintiffs' ability to use and enjoy their properties.

### Fraudulent Concealment

278.     Any applicable statutes of limitation have been tolled by Westgate's knowing, active, and ongoing concealment and denial of the material facts as alleged herein.  Westgate is a sophisticated party with superior knowledge of complex real estate and business transactions. Westgate was and is under a continuous duty to disclose to Plaintiffs the material facts alleged herein, and Plaintiffs reasonably relied on Westgate's knowing, affirmative, and ongoing concealment.

279.    Plaintiffs have been kept ignorant by Westgate of vital information essential to the pursuit of these claims, without any fault or lack of diligence on their part.

### Estoppel

280.    Westgate was and is under a continuous duty to disclose to Plaintiffs the true character, quality, and nature of the timeshare properties and transactions as alleged herein.  That concealment is ongoing.  Plaintiffs reasonably relied on Westgate's knowing failure to disclose and/or active concealment of those facts.  Westgate is estopped from relying on any statutes of limitation in defense of this action.  Additionally, Westgate is estopped from raising any defense of laches due to its own conduct as alleged herein.

281.    Plaintiffs make the following specific fraud allegations with as much specificity as possible, although they do not have access to information necessarily available only to Westgate:

> a.     Who: Westgate, including each of the alter ego Defendants identified in this Complaint, and their agents, servants, and employees utilized a scheme to encourage the active concealment of legally required disclosures (including but not limited to the fact that Plaintiffs had a right to rescind the purchase) and other material facts about the timeshare transactions from Plaintiffs while simultaneously representing that Plaintiffs could use and enjoy their timeshare units whenever they wished, as alleged above.  Plaintiffs are unaware of, and therefore unable to identify, all the names and identities of those specific individuals at Westgate responsible for such decisions, but they include the specific individuals identified in paragraphs 151-154, and Westgate officials David A. Siegel and Richard Siegel.

b.      What: Westgate knows but fails to adequately disclose to purchasers that:
they are not purchasing a share in a specific unit but are instead buying into a
"floating use plan," in which each timeshare owner's fractional interest is diluted
many times more than if that person purchased the right to use a particular unit;
because Westgate artificially restricts the availability of Resort properties, they
will not be able to use an expected Resort property when desired, rendering the
"floating use plan" inadequate in violation of Missouri Time-Sharing Regulation,
Mo. Ann. Stat. § 407.625, and Tennessee Code Tenn. Code. Ann. § 66-32-107;
Westgate encourages and/or allows its commission-based sales and closing agents
to use a "secret pocket" to conceal legally required disclosures about the
purchasers' rights, including their statutory right to rescind their purchase, in
violation of Missouri Time-Sharing Regulation, Mo. Ann. Stat. § 407.620, and
Tennessee Code Tenn. Code. Ann. § 66-32-112(9); Westgate fails to deliver
recorded warranty deeds to owners in a timely fashion, or in some cases at all.

c.      When: Westgate concealed material information starting no later than July
1, 2008, and on an ongoing basis, and continuing to this day, as alleged above.
Westgate has not adequately disclosed the truth about the true nature and
availability of timeshare properties at the Resort, nor purchasers' legal rights
including the right to rescind the transaction and receive a warranty deed, to
anyone outside of Westgate. Westgate has never taken any action to inform
consumers about the true nature and availability of the timeshare properties at the
Resort, or purchasers' rights with respect to the transactions. And when
consumers complained to Westgate about the unavailability of properties,

60

Westgate denied any knowledge of or responsibility for the problem, in many cases attempting to sell purchasers new or upgraded timeshare properties.

d.      Where: Westgate concealed material information regarding the true nature and availability of the timeshare properties, and purchasers' rights in the transaction, in its communications with Plaintiffs and made contrary representations about the nature and availability of the timeshare properties. Plaintiffs are aware of no document, communication, or other place or thing, in which Westgate adequately disclosed the truth about the lack of availability of timeshare properties to anyone outside of Westgate.  Even where certain legal disclosures were included in the fine print of a sales contract or other purchase document, the documents themselves were often concealed from Plaintiffs by commission-based sales and closing agents through the use of a folio containing a secret pocket and the other high-pressure sales tactics described herein, including statements from licensed sales agents which materially contradict the disclosure.

e.      How: Westgate concealed material information regarding the true nature and availability of the timeshare properties, and purchasers' rights in the transaction, at all times, even though it knew about the lack of availability of timeshare properties due to Westgate's artificial restriction of them, and about the legally required disclosures (including the right to rescind), and knew that this information would be important to a reasonable consumer.  Westgate concealed this information by using high-pressure sales tactics, commission-based sales agents, and a black folio containing a secret pocket which closing agents could

use so that purchasers would not be able to find material information (including legally required disclosures) relating to their timeshare transaction.

f.     Why: Westgate actively concealed material information about the timeshare transactions, the legally inadequate floating use plan, the purchasers' ability to use and enjoy their purchase, and each purchaser's right to rescind the transaction for the purpose of inducing Plaintiffs to purchase timeshare properties and, once they owned timeshare properties, to purchase additional timeshare properties and services from Westgate.  Had Westgate disclosed the truth, for example in its sales pitches, advertisements, or other materials or communications, Plaintiffs (and reasonable consumers) would have been aware of it, and would not have bought timeshare properties (including by exercising their right to rescind their purchase contracts), or would have paid less for them.

## FORCE AND EFFECT OF CONTRACTS

282.     Westgate's contracts with purchasers are either void ab initio or voidable and should be rescinded and avoided.

283.     Westgate's contracts with purchasers are void ab initio because they are premised upon a fraud, as more fully detailed herein, and because Westgate does not give purchasers a reasonable opportunity to know the contract's character or essential terms.  Westgate agents often utilize an electronic signature process that automatically applies purchasers' signatures and initials to dozens of pages of contract documents that purchasers are not permitted to adequately read and review.  These signatures are ineffective as a matter of law.

284.     Westgate's contracts with purchasers should be rescinded and avoided because they violate statutes enacted for the protection of the public interests and specifically for the

protection of timeshare purchasers, including but not limited to the Missouri Merchandising

Practices Act, Mo. Code Ann. §  407.010, et seq., the Missouri Time-Sharing Regulation, Mo.

Ann. Stat. § 407.600, et seq., and the Tennessee Time-Share Act, Tenn. Code Ann. § 66-32-101,

et seq., as more fully detailed herein.

285.    Westgate's contracts with purchasers should be rescinded and avoided because

they are based on fraudulent omissions including the failure to disclose to purchasers, inter alia,

that they are not purchasing a share in a specific unit, that Westgate oversells the Resort, that

purchasers cannot reasonably reserve and use their timeshare unit, and that purchasers have a

statutory right to rescind the contract, all as more fully detailed herein.  Additionally, Westgate's

bargaining power is far superior to that of purchasers, and it enters into timeshare contracts by

unconscionable means, including under circumstances where Westgate has undue influence over

purchasers, and/or circumstances that constitute duress and/or an abuse of economic power, as

more fully detailed herein.  For all these reasons, Westgate's contracts with purchasers should be

rescinded and avoided.

### COUNT I-VIOLATION OF THE MISSOURI MERCHANDISING PRACTICES ACT AND MISSOURI TIME-SHARING REGULATION
**(Against all Defendants)**

286.    Plaintiffs hereby re-allege and incorporate by reference verbatim all of the

previous allegations of this petition as if the same were fully set forth herein.

287.    At all relevant times there was in effect Missouri Merchandising Practices

Act, Mo. Code Ann. § 407.010, et seq., the Missouri Time-Sharing Regulation, Mo. Ann.

Stat. § 407.600, et seq.

288.    Section 407.630.1 of the Missouri Time-Sharing Regulation provides, in

pertinent part,  A time-share plan or time-share property is merchandise under the provisions

of this chapter and the sale or offering for sale of such plans or property shall be subject to the provisions of sections 407.010 to 407.140, unless otherwise specifically provided in sections 407.600 to 407.630.

289.    Section 407.025.1 of the M.M.P.A provides, in pertinent part: The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce…in…the state of Missouri, is declared to be an unlawful practice.

290.    Defendants constitutes "persons," as defined by Section 407.010(5) of the Act, and as referenced in Section 407.025.1 of the Act.

291.    Defendants have sold and/or financed "merchandise" in "trade" or "commerce" in the State of Missouri, as those terms are defined by Section 407.010 of the Act. Specifically, Defendants have sold and/or leased timeshares, a type of merchandise under the Act, in their trade and commerce in the State of Missouri.

292.    In selling and financing timeshares in the State of Missouri, Defendants have used or employed deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of material facts relating to its merchandise, all in violation of the Act. Specifically, Defendants have engaged in unlawful practices in one or more of the following ways:

a.    Concealing, suppressing, and/or omitting material facts about the nature of the timeshare purchase transaction.

64

      b.      Violating the duty of good faith in negotiating in solicitation, negotiation, and performance in connection with the advertisement or sale of merchandise in violation of 15 C.S.R. 60-8.040.

      c.      Advertising, marketing, and/or promoting Time-share interests for sale to Plaintiffs and the Class as a legally adequate timesharing plan.

      d.      Providing or assisting in obtaining financing through predatory lending to facilitate the purchase of timeshares to Plaintiffs and The Class; and

      f.      Other actions which will be further discovered.

293.     Defendants knew at the time the timeshare interests were sold to the Plaintiffs and the Class that the ability to use and enjoy the timeshare properties was limited by Defendants policies and procedures.

294.     Section 407.025.1 of the Act further provides, in pertinent part:

Any person who purchases…merchandise primarily for personal, family or household purposes and thereby suffers an ascertainable loss of money…as a result of the use or employment by another person of a method, act or practice declared unlawful by section 407.020, may bring a private civil action in either the circuit court of the county in which the seller…resides or in which the transaction complained of took place, to recover actual damages. The court may, in its discretion, award punitive damages and may award to the prevailing party attorney's fees…and may provide such equitable relief as it deems necessary and proper.

295.     At all relevant times, Plaintiffs purchased the timeshares at issue for "personal family or household purposes."

65

296.     Defendants intended that Plaintiffs and other members of the Class rely on their misrepresentations and omissions.

297.     As a proximate result of Defendants' misrepresentations, omissions and unlawful practices, Plaintiff and other members of the Class suffered an ascertainable loss of money by paying, and financing, the purchase price of a timeshare As such, Plaintiffs and other members of the Class are entitled to bring this action to recover, inter alia, their actual damages, punitive damages, and attorneys' fees available under the Act.

298.     At all times herein, Defendants intentionally engaged in the unlawful practices enumerated above. Further, Defendants acted in reckless or conscious disregard of the interests of Plaintiffs and other Class members, perpetrating their unlawful practices in a willful, wanton, and malicious manner, such that an imposition of punitive damages is warranted.

## COUNT II-VIOLATIONS OF THE TENNESSEE TIME-SHARE ACT OF 1981/RESCISSION PURSUANT TO THE TENNESSEE TIME-SHARE ACT OF 1981
### The Secret Pocket
### (Against all Defendants)

299.     Plaintiffs repeat and incorporate by reference each of the foregoing allegations of this Complaint.

300.     Tenn Code. Ann. §66-32-101, et seq., entitled the Tennessee Time-share Act of 1981 (the "Tennessee Time-share Act"), regulates sellers of time-share interests, and this statute applies to and governs the conduct of the Defendants.

301.     Tenn. Code Ann. §66-32-112 affirmatively requires Westgate to provide Plaintiffs with the Public Offering Statement for the Resort.  Tenn. Code Ann. §66-32-112

provides that a public offering statement "must contain" or "fully and accurately disclose" fifteen different categories of factual information, including, but not limited to, the name and address of the developer, a description of the building units (including completion dates), the type and number of units, a budget and information regarding fees that will be charged, a list of liens and encumbrances, and specific rescission language.

302.    Tenn. Code Ann. §66-32-112(9) requires a time-share developer to include the following language in its Public Offering Statement:

> A statement that within ten (10) days from the date of the signing of the contract made by the purchaser, where the purchaser shall have made an on-site inspection of the time-share project prior to the signing of the contract of purchase, and where the purchaser has not made an on-site inspection of the time-share prior to the signing of the contract of purchase fifteen (15) days from the date of the signing of the contract, the purchaser may cancel the contract for the purchase of a time-share interval from the developer.

303.    Tenn. Code Ann. §66-32-114 provides that a time-share purchase contract is voidable until the purchaser has received the Public Offering Statement.  Tenn. Code Ann §6632-116 requires Westgate to amend its Public Offering Statements to report any material changes to the information required by Tenn. Code Ann. §66-32-112.

304.    Tenn. Code Ann. §66-32-118 provides the Plaintiffs with a claim for relief, including punitive damages and attorney's fees, for Westgate's failure to provide the Public Offering Statement.  Tenn. Code Ann. §66-32-119 contemplates a private right of action for rescission and damages.

305.    Tenn. Code Ann. §66-32-121(a) provides that the Tennessee Real Estate
Commission may adopt rules and regulations "in furtherance of the objectives" of the
Tennessee Time-share Act.  Pursuant to Tenn. Code Ann. §66-32-121(a), the Tennessee
Real Estate Commission has adopted various rules which were in effect at the time of the
transaction described in this Complaint.  These rules include, inter alia, the following:

> **1260.06.02 RECEIPT OF PUBLIC OFFERING STATEMENT**.  Before
> transfer of a time-share interval and no later than the date of any sales
> contract, the developer shall obtain from the purchaser a signed and dated
> receipt for the public offering statement (and any amendments and
> supplements thereto) provided in accordance with Tenn. Code Ann. §66-32-
> 112.  **The receipt shall specify the number of pages in the public offering
> statement as filed with the Commission**.  The developer shall retain such
> receipt for a period of four (4) years from the date thereof.
>
> ...
>
> **1260.06.04 DISCLOSURE OF RESCISSION RIGHTS.**
>
> The following statement shall appear in boldface and conspicuous type in:
>
> (1) Every public offering statement; and
>
> (2) **Every contract for the sale of a time-share interval, immediately
> above the space reserved for the signature of the purchaser:**
>
> "You May Cancel a Contract to Purchase a Time-Share Interval within Ten
> (10) Days from the Date of the Signing of the Contract, Where You Have
> Made an On-Site Inspection of the Time-Share Project Before Signing the
> Contract, and, if You Have Not Made Such an Inspection, within Fifteen (15)
> days from the Date of the Signing of the Contract.  If You Elect to Cancel,
> You May Do So by Hand Delivering Notice to the Seller at [insert address]

within the Designated Period, or by Mailing Notice to the Seller (or His
Agent for Service of Process) by Prepaid United States Mail at [insert
address] Postmarked Anytime within the Designated Period."

(Emphasis added.)

306.    In short, The Tennessee Time-Share Act establishes very clear requirements
regarding the delivery of proper public offering statements and purchase contracts to time-
share purchasers.  Westgate was required to provide the Plaintiffs with an up-to-date public
offering statement that included, among other things, specific rescission language.

307.    Westgate was also required to provide the Plaintiffs with a contract that
included specific rescission language.

308.    By using a folio containing a secret pocket, compensating closing agents on
commission, and encouraging and/or allowing them to hide the public offering statement
and the contract in a secret pocket, Westgate willfully circumvented these requirements.

309.    This conduct is part of a pattern and practice within Westgate that is designed
to reduce the number of contracts that are rescinded.  Specifically:

A. Westgate designs and/or buys folios that contain a secret or hidden pocket.

B. Westgate utilizes a compensation system that penalizes its closing agents when
customers rescind their contracts.

C. Sales at Westgate often follow a predictable pattern in that there is typically a
lengthy and high-pressure sales pitch by the sales agent or agents assigned to a

particular customer, followed by a closing with a different closing agent.  The sales
agents do not typically attend the closing.

D. By the time of the closing, the customers are necessarily tired and worn down
from the sales pitch.

E. During the closing, customers are presented with numerous documents to sign in
short order, with minimal or incorrect explanation by the closing officer, and without
the opportunity to fully review the documents.  Documents signed at closing might
typically include a settlement statement, power of attorney, allonge,
acknowledgement of representations, truth in lending disclosure, acknowledgment of
recording, and other documents.

G. Following the closing, the closing officer typically takes all of the closing
documents that have been signed away to be copied.

H. Later, the purchasers are presented with a black folio to conclude the sales
process.  Typically, the black folio contains numerous documents, including, but not
limited to, sales brochures, maps, resort directories, information regarding Interval
International, and other booklets and brochures. Defendants incentivize the closing
agent and/or sales staff to a) not mention or downplay that the purchasers have a
statutory right of rescission; b) encourage the purchasers to sign the purchase
contract and public offering statement receipt without fully examining the purchase
contract and the public offering statement, and c) place the purchase contract and the
public offering statement in the secret pocket so that the purchasers will not realize

they are in possession of these documents, and will not recognize that they have a statutory right of rescission.

310.    Westgate's use of a secret or hidden pocket is well known among Defendants' sales staff, who sometimes refer to the pocket as the "secret pocket," and it is the subject of numerous consumer complaints and internet posts.  See Brinkmann, "Westgate Resorts denies hiding cancellation documents," Orlando Sentinel (Sept. 30, 2015), available at https://www.orlandosentinel.com/business/brinkmann-on-business/os-westgate-resortscancellation-20150930-post.html.

311.    This process was followed in Plaintiffs' experience at Westgate.  Plaintiffs were worn down by lengthy, high-pressure sales pitches, and were not provided adequate disclosures about their rights or their purchase.

312.    Plaintiffs, despite exercising reasonable diligence, did not know that certain disclosures were mandated by Tennessee law and they did not know that their contract and their public offering statement were often hidden in the secret pocket.  Plaintiffs did not realize that they were missing documents, and they were not told that they had a statutory right of rescission. By utilizing a system whereby closing agents use folios containing a secret pocket, which incentivizes the closing agents to avoid giving the Plaintiffs the disclosures that they are required by law to give, Westgate willfully violated the Tennessee Time-share Act.

313.    All of Westgate's sales agents and closing agents' actions were in the course and scope of their employment with Westgate and for the benefit of Westgate as well as for

themselves, and Westgate is liable for their actions under the doctrine of respondent superior.

314.    Accordingly, for its various violations of the Tennessee Time-share Act and the Rules of the Tennessee Real Estate Commission, which implement the Tennessee Time-share Act, all as described herein, Defendants are liable to the Plaintiffs.  Specifically, pursuant to Tenn. Code Ann. §66-32-118(a), Plaintiffs respectfully request that they be granted rescission of the contracts, compensatory damages, punitive damages, attorney's fees, and other relief.

## COUNT III-VIOLATIONS OF THE TENNESSEE TIME-SHARE ACT OF 1981/RESCISSION PURSUANT TO THE TENNESSEE TIME-SHARE ACT OF 1981
### (Against all Defendants)

315.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations of this Complaint.

316.    In addition to the provisions discussed in Count I, the Tennessee Time-share Act, Tenn. Code Ann. §66-32-102, defines "advertisement" to include "any...verbal... offer by an individual..."

317.     Tenn. Code Ann. §66-32-132(1) provides that no advertising for the sale of a time-share shall contain any representation regarding the availability of a resale or rental program.

318.     Tenn. Code Ann. §66-32-132(2) provides that no advertising for the sale of a time-share shall C=contain an offer or inducement to purchase which purports to be limited

as to quantity or restricted as to time unless the numerical quantity and/or time applicable to the offer or inducement is clearly and conspicuously disclosed.

319.    Tenn. Code Ann. §66-32-132(3) provides that no advertising for the sale of a time-share shall contain any statement regarding the investment merit or profit potential of a time-share interval unless it has been approved by the State.

320.    Tenn. Code Ann. §66-32-132(9) provides that no advertising for the sale of a time-share shall misrepresent the nature or extent of any services incident to the time-share project.

321.    Tenn. Code Ann. §66-32-132(11) provides that no advertising for the sale of a time-share shall make any misleading or deceptive representation with respect to the contents of the time-share program, the purchase contract, the purchaser's rights, privileges, benefits, or obligations under the purchase contract or the Time-share Act.

322.    Defendants violated these provisions of the Tennessee Time-share Act by omitting, failing to make, or hiding material facts and required disclosures, all as described in this Complaint. Specifically, Defendants utilize folders containing a secret pocket, compensate their sales and closing agents on a commission basis, encourage and/or allow them to conceal material facts from consumers regarding the lack of unit availability due to Defendants' practice of overselling the Resort, delay the frequent deliveries of deeds, fail to disclose consumers' statutory rights to rescind, and other material facts alleged in this Complaint.

323.    Westgate's sale and closing agents made these representations in the course and scope of their employment with Westgate, and for Westgate's benefit.  Accordingly, Westgate is liable for their actions pursuant to the doctrine of respondeat superior.

324.    Upon information and belief, Defendants also violated Tenn. Code Ann. § 66-32-113 and its implementing regulations (Tenn. Comp. R. & Regs. 1260-06-.03) by failing to deposit into and maintain funds paid by timeshare purchasers in an escrow account in this state, for the duration of the cancellation period.

325.    Accordingly, for their various violations of the Tennessee Time-share Act and the Rules of the Tennessee Real Estate Commission, which implement the Tennessee Time-share Act, all as described herein, Defendants are liable to Plaintiffs.  Specifically, pursuant to Tenn. Code Ann. §66-32-118(a), Plaintiffs respectfully request that they be granted rescission of the contracts, compensatory damages, punitive damages, attorneys' fees, and other relief.

## COUNT IV-UNJUST ENRICHMENT
### (Against all Defendants)

326.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations of this Complaint.

327.    Plaintiffs conferred benefits upon Westgate in the form of down payments, monthly mortgage payments, recurring maintenance fee payments, and additional fee and membership payments for property at the Resort and membership in Westgate's timeshare and other programs.

328.     Those payments were made with the reasonable expectation that Westgate was selling timeshare properties that could be used and enjoyed by Plaintiffs as represented by Westgate agents, and that Westgate was complying with the Missouri Merchandising Practices Act, The Missouri Time-Sharing Regulation, the Tennessee Time-Share Act and the Tennessee Consumer Protection Act.

329.     It would be unjust to permit Westgate to keep the payments made by Plaintiffs because Westgate induced Plaintiffs to make those payments by failing to disclose the facts material to the transactions.

330.     Plaintiffs, on behalf of themselves and the proposed Class, seek restitution.

## COUNT V-FRAUDULENT MISREPRESENTATION BY OMISSION
### (Against all Defendants)

331.     Plaintiffs repeat and incorporate by reference each of the foregoing allegations of this Complaint.

332.     Defendants engaged in a high-pressure sales pitch designed to induce the Plaintiffs to make a significant financial decision in a short time span with inaccurate information.

333.     Westgate represented to the Plaintiffs that as timeshare owners, they would have no difficulty using their timeshare and would have ample access to reservations.

334.     Westgate represented that it was a timeshare seller in Tennessee, meaning it had an affirmative duty under the Missouri Time-Sharing Regulation, Mo. Ann. Stat. § 407.625, and the Tennessee Time-Share Act, Tenn. Code Ann. § 66-32-101, et seq., to make

certain disclosures, as described in Counts I and II, incorporated by reference herein. Defendants were required to fully and accurately disclose factual information about the property and the purchaser's rights with respect thereto, including but not limited to: reasonable arrangements for management and operation of the time-share program, the type and number of units, a budget and information regarding fees that will be charged, specific language informing the purchaser of his, her, or their right to rescind the agreement, and a public offering statement, which if not received by the purchaser renders the contract voidable.

335.    Westgate was required to disclose to each party to the transaction any adverse facts of which they had actual notice or knowledge, and timely and accurate information regarding market conditions that might affect the transaction; and they were required to provide services to each party to the transaction with honesty and good faith.

336.    Westgate utilized a scheme to confuse consumers regarding their rights and avoid making required disclosures of material fact while selling the timeshares to Plaintiffs.

337.    In carrying out the above-described scheme and failing to make the above described disclosures and/or intentionally hiding them so that the Plaintiffs would not see them, the Defendants fraudulently omitted material information, fraudulently induced the Plaintiffs to remain in the contract through the rescission period, and generally defrauded the Plaintiffs.

338.    Westgate intended for the Plaintiffs to rely on its representations of material fact when the Plaintiffs purchased timeshare interests, and Plaintiffs did indeed rely on its representations.

339.    Specifically, Westgate agents failed to disclose material facts to Plaintiffs Jeffrey Kellough and Emily Kellough in connection with their timeshare purchase in 2015. Among these facts, Westgate failed to adequately disclose that:  the Kelloughs were not purchasing the right to use a specific unit or even type of unit, but were instead purchasing into a "floating use plan" that would not guarantee the Kelloughs ability to stay at the Resort; Westgate regularly and systematically oversold the Resort, preventing them from utilizing their timeshare property; the Kelloughs had a right to rescind the contract, as described in the legally required Public Offering Statement, which Westgate by its agents concealed from the Kelloughs, as more fully described above.

340.    Similarly, Westgate agents failed to disclose material facts to Plaintiffs Wendell Bowsher and Barbara Bowsher in connection with their timeshare purchase in 2003 and the upgrade to their ownership in 2018.   Among these facts, Westgate failed to adequately disclose that: the Bowshers were not purchasing the right to use a specific unit or even type of unit, but were instead purchasing into a "floating use plan" that would not guarantee the Bowshers ability to stay at the Resort; Westgate regularly and systematically oversold the Resort, preventing them from utilizing their timeshare property; the Bowshers had a right to rescind the contract, as described in the legally required Public Offering Statement, which Westgate by its agents concealed from the Bowshers, as more fully described above.

341.     Similarly, Westgate agents failed to disclose material facts to Plaintiffs Brian Hearn and Kathleen Hearn in connection with their timeshare purchase in 1995 and the multiple upgrades to their ownership between 2002 and 2018.  Among these facts, Westgate failed to adequately disclose that:  the Hearns were not purchasing the right to use a specific unit or even type of unit, but were instead purchasing into a "floating use plan" that would not guarantee the their ability to stay at the Resort; Westgate regularly and systematically oversold the Resort, preventing the Hearns from utilizing their timeshare property; the Hearns had a right to rescind the contract, as described in the legally required Public Offering Statement, which Westgate by its agents concealed from the Hearns, as more fully described above.

342.     Similarly, Westgate agents failed to disclose material facts to Plaintiffs Shirley Acree and James Acree in connection with their timeshare purchase in 2018. Among these facts, Westgate failed to adequately disclose that:  the Acrees were not purchasing the right to use a specific unit or even type of unit, but were instead purchasing into a "floating use plan" that would not guarantee their ability to stay at the Resort; Westgate regularly and systematically oversold the Resort, preventing the Acrees from utilizing their timeshare property; the Acrees had a right to rescind the contract, as described in the legally required Public Offering Statement, which Westgate by its agents concealed from the Acrees, as more fully described above.

343.     Similarly, Westgate agents failed to disclose material facts to Plaintiff Rita Baker in connection with her timeshare purchase from a Westgate agent while in Orlando, Florida.  Among these facts, Westgate failed to adequately disclose that:  Ms. Baker was not purchasing the right to use a specific unit or even type of unit, but was instead purchasing

into a "floating use plan" that would not guarantee Ms. Bakers ability to stay at the Resort; Westgate regularly and systematically oversold the Resort, preventing her from utilizing her timeshare property; Ms. Baker had a right to rescind the contract, as described in the legally required Public Offering Statement, which Westgate by its agents concealed from Ms. Baker, as more fully described above.

344.    Similarly, Westgate agents failed to disclose material facts to Plaintiff Cassandra Butler in connection with her timeshare purchase over 10 years ago and the upgrade to her ownership in 2016.  Among these facts, Westgate failed to adequately disclose that:  Ms. Butler was not purchasing the right to use a specific unit or even type of unit, but was instead purchasing into a "floating use plan" that would not guarantee Ms. Butlers ability to stay at the Resort; Westgate regularly and systematically oversold the Resort, preventing her from utilizing her timeshare property; Ms. Butler had a right to rescind the contract, as described in the legally required Public Offering Statement, which Westgate by its agents concealed from Ms. Butler, as more fully described above.

345.    Similarly, Westgate agents failed to disclose material facts to Plaintiffs Ulysee Taylor and Lemoria Taylor in connection with their timeshare purchase in 2017. Among these facts, Westgate failed to adequately disclose that:  the Taylors were not purchasing the right to use a specific unit or even type of unit, but were instead purchasing into a "floating use plan" that would not guarantee the Taylors ability to stay at the Resort; Westgate regularly and systematically oversold the Resort, preventing them from utilizing their timeshare property; the Taylors had a right to rescind the contract, as described in the

79

legally required Public Offering Statement, which Westgate by its agents concealed from the Taylors, as more fully described above.

346.    Similarly, Westgate agents failed to disclose material facts to Plaintiff Dana Coffman in connection with his timeshare purchase over 25 years ago and the upgrade to his ownership in 2017.  Among these facts, Westgate failed to adequately disclose that:  Mr. Coffman was not purchasing the right to use a specific unit or even type of unit, but was instead purchasing into a "floating use plan" that would not guarantee Mr. Coffman's ability to stay at the Resort; Westgate regularly and systematically oversold the Resort, preventing Mr. Coffman from utilizing his timeshare property; Mr. Coffman had a right to rescind the contract, as described in the legally required Public Offering Statement, which Westgate by its agents concealed from Mr. Coffman, as more fully described above.

347.    Similarly, Westgate agents failed to disclose material facts to Plaintiffs James and Marieth Mitchell in connection with their timeshare purchases many years ago.  Among these facts, Westgate failed to adequately disclose that:  the Mitchells were not purchasing the right to use a specific unit or even type of unit, but were instead purchasing into a "floating use plan" that would not guarantee the Mitchells ability to stay at the Resort; Westgate regularly and systematically oversold the Resort, preventing the Mitchells from utilizing their timeshare property; the Mitchells had a right to rescind the contract, as described in the legally required Public Offering Statement, which Westgate by its agents concealed from the Mitchells, as more fully described above.

348.    Similarly, Westgate agents failed to disclose material facts to Plaintiff Donald Kolander in connection with his timeshare purchase in 2007.  Among these facts,

Westgate failed to adequately disclose that:  Mr. Kolander was not purchasing the right to use a specific unit or even type of unit, but was instead purchasing into a "floating use plan" that would not guarantee Mr. Kolander's ability to stay at the Resort; Westgate regularly and systematically oversold the Resort, preventing him from utilizing his timeshare property; Mr. Kolander had a right to rescind the contract, as described in the legally required Public Offering Statement, which Westgate by its agents concealed from Mr. Kolander, as more fully described above.

349.   Similarly, Westgate agents failed to disclose material facts to Plaintiffs Kenneth and Dorisona Nadermann in connection with their timeshare purchase seven years ago.  Among these facts, Westgate failed to adequately disclose that:  the Nadermanns were not purchasing the right to use a specific unit or even type of unit, but were instead purchasing into a "floating use plan" that would not guarantee the Nadermanns ability to stay at the Resort; Westgate regularly and systematically oversold the Resort, preventing them from utilizing their timeshare property; the Nadermanns had a right to rescind the contract, as described in the legally required Public Offering Statement, which Westgate by its agents concealed from the Nadermanns, as more fully described above.

350.   Similarly, Westgate agents failed to disclose material facts to Plaintiff Charles Richardson in connection with his timeshare purchase starting over 20 years ago and the several upgrades to his ownership throughout that time.  Among these facts, Westgate failed to adequately disclose that:  Mr. Richardson was not purchasing the right to use a specific unit or even type of unit, but was instead purchasing into a "floating use plan" that would not guarantee Mr. Richardson's ability to stay at the Resort; Westgate regularly and systematically oversold the Resort, preventing him from utilizing his timeshare

property; Mr. Richardson had a right to rescind the contract, as described in the legally required Public Offering Statement, which Westgate by its agents concealed from Mr. Richardson, as more fully described above.

351.   Similarly, Westgate agents failed to disclose material facts to Plaintiffs Irving Cummings and Grace Cummings in connection with their timeshare purchase in 2002 and the upgrade to their ownership in 2013. Among these facts, Westgate failed to adequately disclose that: the Cummings were not purchasing the right to use a specific unit or even type of unit, but were instead purchasing into a "floating use plan" that would not guarantee their ability to stay at the Resort; Westgate regularly and systematically oversold the Resort, preventing them from utilizing their timeshare property; the Cummings had a right to rescind the contract, as described in the legally required Public Offering Statement, which Westgate by its agents concealed from the Cummings, as more fully described above.

352.   Similarly, Westgate agents failed to disclose material facts to Plaintiff Bonnie Jernigan in connection with her timeshare purchase in 2016 and the upgrade to her ownership in 2017.  Among these facts, Westgate failed to adequately disclose that:  Ms. Jernigan was not purchasing the right to use a specific unit or even type of unit, but was instead purchasing into a "floating use plan" that would not guarantee Ms. Jernigan's ability to stay at the Resort; Westgate regularly and systematically oversold the Resort, preventing her from utilizing her timeshare property; Ms. Jernigan had a right to rescind the contract, as described in the legally required Public Offering Statement, which Westgate by its agents concealed from Ms. Jernigan, as more fully described above.

353.   Similarly, Westgate agents failed to disclose material facts to Plaintiffs Charles Orr and Reba Orr in connection with their timeshare purchase in 2000.  Among

these facts, Westgate failed to adequately disclose that:  the Orrs were not purchasing the right to use a specific unit or even type of unit, but were instead purchasing into a "floating use plan" that would not guarantee their ability to stay at the Resort; Westgate regularly and systematically oversold the Resort, preventing them from utilizing their timeshare property; the Orrs had a right to rescind the contract, as described in the legally required Public Offering Statement, which Westgate by its agents concealed from the Orrs, as more fully described above.

354.    Similarly, Westgate agents failed to disclose material facts to Plaintiff John Wright in connection with his timeshare purchases in 2013.  Among these facts, Westgate failed to adequately disclose that:  Mr. Wright was not purchasing the right to use a specific unit or even type of unit, but was instead purchasing into a "floating use plan" that would not guarantee his ability to stay at the Resort; Westgate regularly and systematically oversold the Resort, preventing him from utilizing his timeshare property; Mr. Wright had a right to rescind the contract, as described in the legally required Public Offering Statement, which Westgate by its agents concealed from Mr. Wright, as more fully described above.

355.    Similarly, Westgate agents failed to disclose material facts to Plaintiffs Clifford Koleski and Donna Koleski in connection with their timeshare purchase in 2015. Among these facts, Westgate failed to adequately disclose that:  the Koleskis were not purchasing the right to use a specific unit or even type of unit, but instead purchasing into a "floating use plan" that would not guarantee their ability to stay at the Resort; Westgate regularly and systematically oversold the Resort, preventing them from utilizing their timeshare property; the Koleskis had a right to rescind the contract, as described in the

legally required Public Offering Statement, which Westgate by its agents concealed from the Koleskis, as more fully described above.

356.    Similarly, Westgate agents failed to disclose material facts to Plaintiff Paige Smith in connection with her timeshare purchases in 2019.  Among these facts, Westgate failed to adequately disclose that:  Ms. Smith was not purchasing the right to use a specific unit or even type of unit, but instead purchasing into a "floating use plan" that would not guarantee her ability to stay at the Resort; Westgate regularly and systematically oversold the Resort, preventing Ms. Smith from utilizing her timeshare property; Ms. Smith had a right to rescind the contract, as described in the legally required Public Offering Statement, which Westgate by its agents concealed from Ms. Smith, as more fully described above.

357.    Similarly, Westgate agents failed to disclose material facts to Plaintiff Walter Washington in connection with his timeshare purchase years ago and the upgrade to his ownership in 2019.  Among these facts, Westgate failed to adequately disclose that:  Mr. Washington was not purchasing the right to use a specific unit or even type of unit, but was instead purchasing into a "floating use plan" that would not guarantee his ability to stay at the Resort; Westgate regularly and systematically oversold the Resort, preventing Mr. Washington from utilizing his timeshare property; Mr. Washington had a right to rescind the contract, as described in the legally required Public Offering Statement, which Westgate by its agents concealed from Mr. Washington, as more fully described above.

358.    Similarly, Westgate agents failed to disclose material facts to Plaintiffs Veronica and William Mauck in connection with their timeshare purchase years ago and the upgrade to their ownership in 2015.  Among these facts, Westgate failed to adequately

84

disclose that:  the Maucks were not purchasing the right to use a specific unit or even type of unit, but were instead purchasing into a "floating use plan" that would not guarantee their ability to stay at the Resort; Westgate regularly and systematically oversold the Resort, preventing the Maucks from utilizing their timeshare property; the Maucks had a right to rescind the contract, as described in the legally required Public Offering Statement, which Westgate by its agents concealed from the Maucks, as more fully described above.

359.    Similarly, Westgate agents failed to disclose material facts to Plaintiff John Thomas, Sr. in connection with his timeshare purchase in 2017 and the upgrade to his ownership in 2018.  Among these facts, Westgate failed to adequately disclose that:  Mr. Thomas was not purchasing the right to use a specific unit or even type of unit, but was instead purchasing into a "floating use plan" that would not guarantee his ability to stay at the Resort; Westgate regularly and systematically oversold the Resort, preventing Mr. Thomas from utilizing his timeshare property; Mr. Thomas had a right to rescind the contract, as described in the legally required Public Offering Statement, which Westgate by its agents concealed from Mr. Thomas, as more fully described above.

360.    Similarly, Westgate agents failed to disclose material facts to Plaintiffs Thomas and Jacquie Haynes in connection with their timeshare purchase years ago and the upgrade to their ownership in 2019.  Among these facts, Westgate failed to adequately disclose that:  the Haynes were not purchasing the right to use a specific unit or even type of unit, but were instead purchasing into a "floating use plan" that would not guarantee their ability to stay at the Resort; Westgate regularly and systematically oversold the Resort, preventing the Haynes from utilizing their timeshare property; the Haynes had a right to

rescind the contract, as described in the legally required Public Offering Statement, which Westgate by its agents concealed from the Haynes, as more fully described above.

361.    Similarly, Westgate agents failed to disclose material facts to Plaintiffs Jeffrey Gay and Karen Gay in connection with their timeshare purchase years ago in Orlando, Florida, and the upgrade to their ownership in 2009.  Among these facts, Westgate failed to adequately disclose that:  the Gays were not purchasing the right to use a specific unit or even type of unit, but instead purchasing into a "floating use plan" that would not guarantee their ability to stay at the Resort; Westgate regularly and systematically oversold the Resort, preventing the Gays from utilizing their timeshare property; the Gays had a right to rescind the contract, as described in the legally required Public Offering Statement, which Westgate by its agents concealed from the Gays, as more fully described above.

362.    Similarly, Westgate agents failed to disclose material facts to Plaintiff Raymond Dage in connection with his timeshare purchase in 1992 and the upgrade and transfer of his ownership in 2014.  Among these facts, Westgate failed to adequately disclose that:  Mr. Dage was not purchasing the right to use a specific unit or even type of unit, but instead purchasing into a "floating use plan" that would not guarantee his ability to stay at the Resort; Westgate regularly and systematically oversold the Resort, preventing Mr. Dage from utilizing his timeshare property; Mr. Dage had a right to rescind the contract, as described in the legally required Public Offering Statement, which Westgate by its agents concealed from Mr. Dage, as more fully described above.

363.    Similarly, Westgate agents failed to disclose material facts to Plaintiffs Stanley Comer and Patricia Comer in connection with their timeshare purchase in 2019.

Among these facts, Westgate failed to adequately disclose that:  the Comers were not purchasing the right to use a specific unit or even type of unit, but instead purchasing into a "floating use plan" that would not guarantee their ability to stay at the Resort; Westgate regularly and systematically oversold the Resort, preventing the Comers from utilizing their timeshare property; the Comers had a right to rescind the contract, as described in the legally required Public Offering Statement, which Westgate by its agents concealed from the Comers, as more fully described above.

364.     Similarly, Westgate agents failed to disclose material facts to Plaintiffs Troy Thompson and Martha Thompson in connection with their timeshare purchase in 2015. Among these facts, Westgate failed to adequately disclose that:  the Thompsons were not purchasing the right to use a specific unit or even type of unit, but were instead purchasing into a "floating use plan" that would not guarantee their ability to stay at the Resort; Westgate regularly and systematically oversold the Resort, preventing the Thompsons from utilizing their timeshare property; the Thompsons had a right to rescind the contract, as described in the legally required Public Offering Statement, which Westgate by its agents concealed from the Thompsons, as more fully described above.

365.     Similarly, Westgate agents failed to disclose material facts to Plaintiffs Mac Williams and Colleen Williams in connection with their timeshare purchase starting over 20 years ago and the several upgrades to their ownership throughout that time.  Among these facts, Westgate failed to adequately disclose that:  the Williams were not purchasing the right to use a specific unit or even type of unit, but were instead purchasing into a "floating use plan" that would not guarantee their ability to stay at the Resort; Westgate regularly and

systematically oversold the Resort, preventing the Williams from utilizing their timeshare property; the Williams had a right to rescind the contract, as described in the legally required Public Offering Statement, which Westgate by its agents concealed from the Williams, as more fully described above.

366.    Similarly, Westgate agents failed to disclose material facts to Plaintiffs Rodney Meyer and Katharine Meyer in connection with their timeshare purchase in 2018. Among these facts, Westgate failed to adequately disclose that:  the Meyers were not purchasing the right to use a specific unit or even type of unit, but were instead purchasing into a "floating use plan" that would not guarantee their ability to stay at the Resort; Westgate regularly and systematically oversold the Resort, preventing them from utilizing their timeshare property; the Meyers had a right to rescind the contract, as described in the legally required Public Offering Statement, which Westgate by its agents concealed from the Meyers, as more fully described above.

367.    Similarly, Westgate agents failed to disclose material facts to Plaintiffs Alvin Caprietta and Cheryl Jones in connection with their timeshare purchase in 2019.  Among these facts, Westgate failed to adequately disclose that: the Jones were not purchasing the right to use a specific unit or even type of unit, but were instead purchasing into a "floating use plan" that would not guarantee their ability to stay at the Resort; Westgate regularly and systematically oversold the Resort, preventing them from utilizing their timeshare property; the Jones had a right to rescind the contract, as described in the legally required Public Offering Statement, which Westgate by its agents concealed from the Jones, as more fully described above.

368.     Similarly, Westgate agents failed to disclose material facts to Plaintiffs Larry South and Jeanne South-Shawhan in connection with their timeshare purchases in 2018. Among these facts, Westgate failed to adequately disclose that: Larry South and Jeanne South-Shawhan were not purchasing the right to use a specific unit or even type of unit, but were instead purchasing into a "floating use plan" that would not guarantee their ability to stay at the Resort; Westgate regularly and systematically oversold the Resort, preventing them from utilizing their timeshare property; Larry South and Jeanne South-Shawhan had a right to rescind the contract, as described in the legally required Public Offering Statement, which Westgate by its agents concealed from the Larry South and Jeanne South-Shawhan, as more fully described above.

369.     Defendants knew, or should have known, that they were omitting and failing to make certain required disclosures.  The omissions described herein were material in nature and were made to induce the Plaintiffs to enter a contract and purchase a time-share interest.  Plaintiffs reasonably and justifiably relied upon Defendants' representations that omitted material facts in deciding to purchase the time-share interests.  Defendants knew of the falsity of the representations, or had utter disregard for their truth, when they were made. Defendants intended to induce reliance upon the representations.  Plaintiffs were entitled to rely upon the representations, since the representations concerned complex matters of Westgate programs and real estate law.  Plaintiffs' reliance was reasonable under the circumstances.

370.    Plaintiffs were injured and damaged by virtue of their reasonable reliance on these representations containing omissions.  Had Plaintiffs known the truth, they would not have purchased the timeshares.

371.    Defendants' omissions were intentionally made for the purpose of inducing the Plaintiffs to enter a contract, close the sale, and remain in the contract without knowing about their rescission rights.  Westgate sales agent work on commission and received commissions from the sale to the Plaintiffs.  In the alternative, if the Defendants' omissions were not intentional, they were grossly negligent, as the Defendants knew or should have known the truth regarding Westgate, its policies, and its procedures.

372.    At all times relevant, the sales agents and other individuals described herein were acting as agents of Westgate, and their actions, which were performed in the scope of their employment with Westgate, are attributable to Westgate pursuant to the doctrine of respondent superior.

373.    For all of the reasons set forth herein, the Plaintiffs were induced to purchase a time-share interest from Westgate by fraud.  The omissions of material fact, combined with the high-pressure sales pitch, and the confusing nature of the written documents between the parties were all part of a scheme devised to induce the Plaintiffs to buy a time-share from Westgate at substantial cost to the Plaintiffs without complying with Missouri and Tennessee law.

374.    The sale, and any contract between the parties, should be rescinded, with all sums paid returned to the Plaintiffs and with the time-share interest returned to Westgate.  In

addition, the Plaintiffs should recover all damages and other relief to which they are entitled, including punitive damages, which are warranted for the intentional deceptive, unfair, and fraudulent conduct of the Defendants.

## COUNT VI-FRAUD IN THE INDUCEMENT
### (Against all Defendants)

375.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations of this Complaint.

376.    Defendants engaged in a high-pressure sales pitch designed to induce the Plaintiffs to make a significant financial decision in a short time span with inaccurate information.

377.    Defendants had an affirmative duty under Missouri Merchandising Practices Act, Mo. Code Ann. § 407.010, et seq., the Missouri Time-Sharing Regulation, Mo. Ann. Stat. § 407.600, et seq., and the Tennessee Time-Share Act, Tenn. Code Ann. § 66-32-101, et seq.  to make certain disclosures, as described in Counts I and II, incorporated by reference herein.  Defendants were required to fully and accurately disclose factual information about the property and the purchaser's rights with respect thereto, including but not limited to: the type and number of units, a budget and information regarding fees that will be charged, specific language informing the purchaser of his, her, or their right to rescind the agreement, and a public offering statement, which if not received by the purchaser renders the contract voidable.

378.    The Westgate defendants were required to disclose to each party to the transaction any adverse facts of which they had actual notice or knowledge, and timely and

accurate information regarding market conditions that might affect the transaction; and they were required to provide services to each party to the transaction with honesty and good faith.

379.    By utilizing a scheme to avoid making the above-described disclosures and/or intentionally hiding them so that the Plaintiffs would not see them, the Defendants fraudulently omitted material information, fraudulently induced the Plaintiffs to remain in the contract through the rescission period, and generally defrauded the Plaintiffs.

380.    Defendants knew, or should have known, that they were omitting and failing to make certain required disclosures.  The omissions described herein were material in nature and were made to induce the Plaintiffs to enter a contract and purchase a time-share interest.  Plaintiffs reasonably and justifiably relied upon Defendants' representations that omitted material facts in deciding to purchase the time-share interests.  Defendants knew of the falsity of the representations, or had utter disregard for their truth, when they were made. Defendants intended to induce reliance upon the representations.  Plaintiffs were entitled to rely upon the representations, since the representations concerned complex matters of Westgate programs and real estate law.  Plaintiffs' reliance was reasonable under the circumstances.

381.    Plaintiffs were injured and damaged by virtue of their reliance on these representations containing omissions.  Had Plaintiffs known the truth, they would not have purchased the time-shares.

382.    Defendants' omissions were intentionally made for the purpose of inducing the Plaintiffs to enter a contract, close the sale, and remain in the contract without knowing about their rescission rights.  Westgate sales agent work on commission and received commissions from the sale to the Plaintiffs.  In the alternative, if the Defendants' omissions were not intentional, they were grossly negligent, as the Defendants knew or should have known the truth regarding Westgate, its policies, and its procedures.

383.    At all times relevant, the sales agents and other individuals described herein were acting as agents of Westgate, and their actions, which were performed in the scope of their employment with Westgate, are attributable to Westgate pursuant to the doctrine of respondent superior.

384.    For all of the reasons set forth herein, the Plaintiffs were induced to purchase a time-share interest from Westgate by fraud.  The omissions of material fact, combined with the high-pressure sales pitch, and the confusing nature of the written documents between the parties were all part of a scheme devised to induce the Plaintiffs to buy a time-share from Westgate at substantial cost to the Plaintiffs without complying with Tennessee law.

385.    The sale, and any contract between the parties, should be rescinded, with all sums paid returned to the Plaintiffs and with the time-share interest returned to Westgate.  In addition, the Plaintiffs should recover all damages and other relief to which they are entitled, including punitive damages, which are warranted for the intentional deceptive, unfair, and fraudulent conduct of the Defendants

## COUNT VII-NEGLIGENT MISREPRESENTATION BY OMISSION

### (Against All Defendants)

386.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations of this Complaint.

387.    Westgate sales agents are licensed as time-share salesmen by the State of Tennessee.  In addition, Westgate (through related entity Westgate Marketing, LLC) serves as a broker for these licensees.  Defendants are agents, servants, partners, aiders and abettors, co-conspirators, and/or joint ventures and subject to a unity of interest, ownership, and control, and are alter egos of one another, as more fully alleged above.

388.    Defendants and Westgate sales agents are governed by the Missouri Merchandising Practices Act, the Missouri Time-Sharing Regulation, the Tennessee Real Estate Commissions.

389.    Section 407.025.1 of the M.M.P.A provides, in pertinent part: The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce…in…the state of Missouri, is declared to be an unlawful practice.

390.    the Missouri Time-Sharing Regulation, Mo. Ann. Stat. § 407.625, requires the timeshare developer prior to the execution of any contract between the purchaser and the timeshare developer, to deliver to the purchaser certain information, and the purchaser shall certify, in writing, to the receipt of such written information. As relevant to this lawsuit, the required information includes:

a.      A complete and accurate description of all limitations, restrictions, or priorities employed in the operation of the exchange program, including, but not limited to, limitations on exchanges based on seasonality, unit size, or levels of occupancy, expressed in boldfaced type, and, in the event that such limitations, restrictions, or priorities are not uniformly applied by the exchange program, a clear description of the manner in which they are applied;

b.      The number of units in each property participating in the exchange program which are available for occupancy and which qualify for participation in the exchange program, expressed within the following numerical groupings: 1-5, 6-10, 11-20, 21-50, and 51 and over; and

c.      The number of owners with respect to each time-share plan or other property which are eligible to participate in the exchange program expressed within the following numerical groupings: 1-100, 101-249, 250-499, 500-999, and 1,000 and over; and a statement of the criteria used to determine those owners who are currently eligible to participate in the exchange program;

391.    Tenn. Code Ann. §62-13-403 provides, in relevant part, that real estate licensees in Tennessee owe "all parties" to a real estate transaction the following duties:

**§62-13-403.  Duties owed to all parties**

A licensee who provides real estate services in a real estate transaction shall owe all parties to the transaction the following duties, except as provided otherwise by §62-13-405, in addition to all other duties specifically set forth in this chapter or the rules of the commission:

(1) Diligently exercise reasonable skill and care in providing services to all parties to the transaction.,

(2) Disclose to each party to the transaction any adverse facts of which the licensee has actual notice of knowledge.,

(3) Maintain for each party to a transaction the confidentiality.,

(4) Provide services to each party to the transaction with honesty and good faith.,

(5) Disclose to each party to the transaction timely and accurate information regarding market conditions that might affect the transaction only when information is available through public records and when the information is requested by a party.,

(6) Timely account for trust fund deposits...; and

392.     Defendants and their sales agents also had a duty to disclose material facts that affected the timeshare property's value and were not known or reasonably discoverable by Plaintiffs and the proposed class through the exercise of ordinary diligence.

393.     As described in this Complaint, Defendants and their sales agents breached these duties, and, in fact, intentionally defrauded the Plaintiffs rather than provide them with accurate information honestly and in good faith.  Defendants, in the course of their business and in the course of a transaction in which they had a pecuniary interest, supplied false information for the guidance of Plaintiffs and proposed class members, omitted material facts about the transaction affecting the property's value, and failed to exercise reasonable care or competence in obtaining or communicating that information.

394.     Defendants and their sales agents knew, among other facts described herein, that Plaintiffs and proposed class members were not buying a share in a specific unit but were instead

buying into a "floating use plan"; that Plaintiffs and proposed class members would not be able to use a Resort property when desired due to Westgate's artificial restriction of availability; and that Plaintiffs and proposed class members had a right to rescind their timeshare purchase under Tennessee law.  They failed to adequately disclose these material facts to Plaintiffs, as more fully described herein.

395.    Defendants and their sales agents did this for their own pecuniary benefit, in the form of commissions and increased payments to Westgate.

396.    Defendants' omissions of material fact described herein constituted material inducements to Plaintiffs and proposed class members to purchase timeshare property at Westgate Smoky Mountain Resort, to pay other charges and fees at the time of purchase, to upgrade to purportedly superior properties, and to pay charges and fees during the period of ownership.

397.    Plaintiffs were entitled to rely upon the representations of the Defendants and their sales agents, given the respective position of the parties and the duties owed by real estate licensees and sellers of real property.  Ordinary diligence by Plaintiffs would not have revealed the undisclosed facts.  Plaintiffs and proposed class members were induced to act by the representations of Defendants and their sales agents, and did act, in ignorance of the falsity of the representations and with a reasonable belief that the representations were true. Plaintiffs' reliance was reasonable and justifiable, and caused them to be damaged.

398.    At the time, the statements omitting material facts were made, Defendants and their sales agents knew that they were false.  In short, Defendants and their sales agents deceived the Plaintiffs intentionally and for the purpose of closing the sale, for the benefit of themselves

(via their commissions) and for the benefit of Westgate, breaching duties owed to Plaintiffs and proposed class members.

399.    For all of these reasons, the Contract should be rescinded, and Defendants should be liable for the damages they have caused Plaintiffs, and for punitive damages.

**COUNT VIII-BREACH OF CONTRACT**

**(IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING)**

**(Against all Defendants)**

400.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations of this Complaint.

401.    Plaintiffs and members of the proposed class contracted with Defendants to purchase timeshare properties at the various Westgate Resorts.

402.    Good faith is an element of every contract pertaining to the purchase of timeshare property.  Whether by common law or statute, all such contracts impose upon each party a duty of good faith and fair dealing.  Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain.  Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.  Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

403.    Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes his conduct to be justified.  Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.  Examples of bad faith are evasion of the spirit of the bargain, willful rendering of imperfect performance, abuse of

98

a power to specify terms, and interference with or failure to cooperate in the other party's

performance. Defendants breached their timeshare purchase contracts with Plaintiffs and

proposed class members, and specifically the covenant of good faith and fair dealing,

through Defendants' omissions, misrepresentations, and practices as alleged herein.

404.    Plaintiffs and proposed class members have performed all, or substantially

all, of the obligations imposed on them under the subject contracts.

405.    Plaintiffs and proposed class members have sustained damages as a result of

Defendants' breach of the contract.

406.    As a result of these breaches, the contracts should be rescinded, and

Defendants should be liable for the damages they have caused Plaintiffs and proposed class

members, and for punitive damages.

## COUNT IX-BREACH OF CONTRACT

### (Against all Defendants)

407.    Plaintiffs repeat and incorporate by reference each of the foregoing

allegations of this Complaint.

408.    Plaintiffs and members of the proposed class contracted with Defendants to

purchase timeshare properties at the various Westgate Resorts.

409.    Defendants breached their timeshare purchase contracts with Plaintiffs and

proposed class members through Defendants' omissions, misrepresentations, and practices

as alleged herein, specifically including (but not limited to) Defendants' failure to

adequately disclose to Plaintiffs and proposed class members that Westgate artificially

restricted the availability of timeshare units, Defendants' scheme to avoid providing

required disclosures, and Defendants' failure to provide the Plaintiffs and proposed class members the opportunity to use and enjoy their purchases.

410.    Plaintiffs and proposed class members have performed all, or substantially all, of the obligations imposed on them under the subject contracts.

411.    Plaintiffs and proposed class members have sustained damages as a result of Defendants' breach of the contract, including but not limited to the funds lost as described herein, and the lack of use and enjoyment of the timeshare properties purchased by Plaintiffs.

412.    As a result of these breaches, the contracts should be rescinded, and Defendants should be liable for the damages they have caused Plaintiffs and proposed class embers, and for punitive damages.

## COUNT X-CIVIL CONSPIRACY
### (Against all Defendants)

413.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations of this Complaint.

414.    Defendants agreed to join a conspiracy related to defrauding consumers in the purchase of timeshare properties seemingly, but not actually, in compliance with the law of Tennessee.

415.    Each Defendant exercised control over each other Defendant and/or all Defendants were under common control, see supra ¶¶ 48-50, in ways that will be revealed during discovery through the production of evidence that is presently in the exclusive control of Defendants.

416.    The conspiracy had a common design, jointly and knowingly established by Defendants acting through their agents and employees.

417.    Defendants knew that the object of this conspiracy was to market and sell timeshare properties to Plaintiffs and proposed class members, without adequately disclosing, among other material facts described herein, that Plaintiffs and proposed class members were not buying a share in a specific unit but were instead buying into a "floating use plan"; that Plaintiffs and proposed class members would not be able to use a Resort property when desired due to Westgate's artificial restriction of availability; and that Plaintiffs and proposed class members had a right to rescind their timeshare purchase under Tennessee law.  The objects of the conspiracy were fraud, breach of contract, unjust enrichment, negligent misrepresentation, and/or violations of the Missouri Time-Sharing Regulations and the Tennessee Time-Share Act, as described more fully herein.  Defendants knew that these objects were unlawful and would be accomplished by unlawful means such as fraud, misrepresentations, and omissions.

418.    Defendants had a meeting of the minds on the object of or course of action for this conspiracy.  Defendants knew and agreed upon the unlawful object or course of action for this conspiracy. Defendants also knew that their wrongful actions would inflict injury upon the targets of the conspiracy, including Plaintiffs.

419.    As described above, Defendants committed multiple unlawful and overt acts to further the object or course of action for this conspiracy as described above.

420.    These unlawful acts proximately caused the damages suffered by Plaintiffs.  Accordingly, Plaintiffs are entitled to recover their actual damages, plus costs, attorneys' fees, and pre-judgment interest and post-judgment interest.

## **PRAYER FOR RELIEF**

In light of the foregoing, Plaintiffs respectfully request:

1. That an injunction be issued declaring that Plaintiffs have a right to rescind the timeshare purchase contracts and that Defendants must disgorge profits received from them; and enjoining Defendants from using folders containing secret pockets, utilizing a "delayed closing" deed delivery system that invites fraud, violating the Missouri Merchandising Practices Act, Missouri Timeshare Regulations, and the Tennessee Time-Share Act as applicable in each case, continuing to breach the contracts described herein, and specifically from selling timeshare properties while restricting purchasers' ability to use them, failing to disclose that their availability is limited, and failing to disclose that purchasers have a right to rescind their purchase.

2. Judgment to be entered against all Defendants on all causes of action and damages suffered.

3. Plaintiffs be awarded the full, fair, and complete recovery for all causes of action and damages suffered.

4. Plaintiffs be awarded rescission, damages, punitive damages, restitution, attorneys' fees, and costs.

5. Plaintiffs be awarded all appropriate costs, fees, expenses, and pre-judgment and post-judgment interest, as authorized by law; and such other relief that the Court deems just and proper.

## **JURY TRIAL DEMAND**

Plaintiffs request a jury trial on all questions of fact raised by this Complaint.

Dated: June 23, 2020

Respectfully submitted,

Consumer Law Protection Lawyers

By:/s/Michael Sokolik_____
Michael Sokolik MO Bar #44057
Attorney at Law
8600 Daniel Dunklin Blvd.
Pevely, MO 63070
(314)-686-4630
michaels@consumerlawprotection.com

*Attorney for Plaintiffs*